I concur in the denial of rehearing as to the issue of parol evidence in Part II.B. of the majority opinion. However, I would grant the rehearing in order to affirm damages that I believe Duravision, Inc. and Manufacturers Product Research Group proved with reasonable certainty and those damages that Federal did not contest at trial.

Richard T. VAN BERGEN, Appellant,

v.

STATE OF MINNESOTA; Hubert H. Humphrey, III, in his capacity as Attorney General of the State of Minnesota, Appellees.

No. 94–3047.

United States Court of Appeals, Eighth Circuit.

Submitted March 15, 1995.

Decided July 14, 1995.

Daryl J. Bergmann, Bloomington, MN (argued), for appellant.

Peter Martin Ackerberg, Asst. Atty. Gen., St. Paul, MN (argued), for appellee.

Before MAGILL, Circuit Judge, JOHN R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

MAGILL, Circuit Judge.

Richard Van Bergen appeals the district court's [1] dismissal of his request for a permanent injunction and declaratory relief against

---

1. The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota.

the enforcement of Minn.Stat. §§ 325E.26–.31, which regulates the use of automatic telephone dialing-announcing devices. In this appeal, Van Bergen argues that the statute violates his rights under the freedom of speech clause of the First Amendment and the due process and equal protection clauses of the Fourteenth Amendment, that the statute is unconstitutionally vague, and that it is preempted by federal law. We affirm.

## I. BACKGROUND

In 1987, Minnesota introduced a statute regulating the use of automatic dialing-announcing devices (ADADs).[2] These machines can dial telephone numbers either according to a pattern (*e.g.*, consecutive or random numbers) or as programmed, and, when the telephone is answered, deliver a recorded message. They are increasingly widely used to inexpensively reach a large number of people for telemarketing, fundraising and other purposes. The statute was challenged in Minnesota state court in 1992 on the grounds that it was in violation of the First Amendment. *State by Humphrey v. Casino Mktg.*, 491 N.W.2d 882 (Minn.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1648, 123 L.Ed.2d 269 (1993). The court interpreted the statute to apply to commercial solicitation ADAD calls only, and upheld the statute as a reasonable time, place and manner restriction on commercial speech, applying the test found in *Central Hudson Gas & Electric Corp. v. Public Service Comm. of N.Y.*, 447

2. Sections 325E.26–.31 read:

**325E.26. Definitions**
 **Subdivision 1. Scope.** The terms used in sections 325E.26 to 325E.30 have the meanings given them in this section.
 **Subd. 2. Automatic dialing-announcing device.** "Automatic dialing-announcing device" means a device that selects and dials telephone numbers and that, working alone or in conjunction with other equipment, disseminates a prerecorded or synthesized voice message to the telephone number called.
 **Subd. 3. Caller.** "Caller" means a person, corporation, firm, partnership, association, or legal or commercial entity who attempts to contact, or who contacts, a subscriber in this state by using a telephone or a telephone line.
 **Subd. 4. Commercial telephone solicitation.** "Commercial telephone solicitation" means any unsolicited call to a residential subscriber when the person initiating the call has not had a prior business or personal relationship with the subscriber, and when the purpose of the call is to solicit the purchase or the consideration of purchase of goods or services by the subscriber. Commercial telephone solicitation does not include calls initiated by organizations listed in section 290.21, subdivision 3, clauses (a) to (e).
 **Subd. 5. Subscriber.** "Subscriber" means a person who has subscribed to telephone service from a telephone company or the other persons living or residing with the subscribing persons.
**325E.27. Use of prerecorded or synthesized voice messages**
 A caller shall not use or connect to a telephone line an automatic dialing-announcing device unless: (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered. This section and section 325E.30 do not apply to (1) messages from school districts to students, parents, or employees, (2) messages to subscribers with whom the caller has a current business or personal relationship, or (3) messages advising employees of work schedules.
**325E.28 Requirements on automatic dialing-announcing devices**
 A caller shall not use an automatic dialing-announcing device unless the device is designed and operated so as to disconnect within ten seconds after termination of the telephone call by the subscriber.
**325E.29. Message requirements**
 Where the message is immediately preceded by a live operator, the operator must, at the outset of the message, disclose:
 (1) the name of the business, firm, organization, association, partnership, or entity for which the message is being made;
 (2) the purpose of the message;
 (3) the identity or kinds of goods or services the message is promoting; and
 (4) if applicable, the fact that the message intends to solicit payment or commitment of funds.
**325E.30. Time of day limit**
 A caller shall not use an automatic dialing-announcing device nor make any commercial telephone solicitation before 9:00 a.m. or after 9:00 p.m.
**325E.31. Remedies.**
 A person who is found to have violated sections 325E.27 to 325E.30 is subject to the penalties and remedies, including a private right of action to recover damages, as provided in section 8.31.

U.S. 557, 566, 100 S.Ct. 2343, 2351, 65 L.Ed.2d 341 (1980).[3]

In 1994, taking effect on July 1 of that year, the Minnesota legislature amended the statute, adding subdivision 6 to § 325E.26: " 'Message' means any call, regardless of its content."

In the meantime, Richard Van Bergen had declared his candidacy for Minnesota governor. Van Bergen planned to use ADAD calls extensively as an inexpensive way to reach potential voters. After the amendment to the statute was enacted, he contacted the Attorney General's office to determine whether enforcement of the amended act would affect his campaign plans. The Attorney General's representatives informed Van Bergen that the amended statute would be enforced against ADAD calls of any content, not only against commercial solicitation ADAD calls. Van Bergen had planned to use ADAD messages that did not request donations or solicit purchases; the messages provided information about Van Bergen and his campaign for governor, and included a toll-free telephone number that recipients could call to obtain further information. The statute, therefore, had not applied to Van Bergen before the amendment, but did apply to him thereafter.

In June 1994, Van Bergen applied to the district court for a temporary restraining order against the enforcement of the amended statute; his application was denied. An expedited court trial followed on his request for declaratory and permanent injunctive relief. At trial, the government presented affidavits concerning the numerous complaints the Attorney General's office had received about ADAD calls to both businesses and residences, and specific incidents in which ADAD calls had disrupted the operation of hospitals and other entities. The district court dismissed Van Bergen's request for relief, finding that the statute was a content-neutral time, place or manner restriction on speech in a limited public forum, and that the restrictions met the standard for time, place or manner restrictions set forth in *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753, 105 L.Ed.2d 661 (1989). This appeal followed.

## II. DISCUSSION

### A. Threshold Issues

We address first three threshold issues: whether Van Bergen's challenge to the statute has been rendered moot by the fact that the primary election is over; whether Minnesota's ADAD provisions are preempted by the Federal Telephone Consumer Protection Act; and whether the statute was enacted in compliance with the Minnesota Constitution.

### 1. Mootness

 The government argues that, because the specific campaign in which Van Bergen sought to use ADAD calls is over, his request for injunctive and declarative relief from the ADAD statutes is moot. We do not have jurisdiction over cases in which "due to the passage of time or a change in circumstance, the issues presented ... will no longer be 'live' or the parties will no longer have a legally cognizable interest in the outcome of the litigation." *Arkansas AFL–CIO v. F.C.C.*, 11 F.3d 1430, 1435 (8th Cir.1993) (en banc). In such a situation, the case has become moot. There is, however, an excep-

---

**3.** A majority of the states have enacted regulation of ADAD calls, some restricting only commercial solicitation ADAD calls, and others restricting all ADAD calls. ADAD statutes restricting only commercial solicitation calls have thus far been subject to constitutional challenges in two states other than Minnesota: Oregon and New Jersey. In both states, the statutes were struck down as impermissible content-based restrictions. *See Moser v. Frohnmayer*, 315 Or. 372, 845 P.2d 1284 (1993); *Lysaght v. State*, 837 F.Supp. 646 (D.N.J. 1993). In 1991, the federal government enacted a bill restricting all ADAD calls, the Telephone Consumer Protection Act, 47 U.S.C. § 227 (1991). The Ninth Circuit recently upheld the federal restrictions against a First Amendment challenge, *Moser v. F.C.C.*, 46 F.3d 970 (9th Cir. 1995), and the Supreme Court denied certiorari — U.S. —, 115 S.Ct. 2615, 132 L.Ed.2d 857 (1995).

In a recent decision, *Florida Bar v. Blakely*, — U.S. —, 115 S.Ct. 2371, 132 L.Ed.2d 541 (1995), the Supreme Court reaffirmed the *Central Hudson* test as the appropriate standard to apply to restrictions on commercial speech, and upheld a regulation prohibiting attorneys from sending targeted solicitation mail to accident victims for thirty days after an accident. *Id.* at —, 115 S.Ct. at 2375–76.

tion to the mootness doctrine in cases which are " 'capable of repetition yet evading review.' " *Id.* (quoting *Weinstein v. Bradford,* 423 U.S. 147, 148–49, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam)). We have jurisdiction to hear an otherwise moot case when the challenged action is of too short a duration to be litigated fully prior to its cessation or expiration, and there is a reasonable expectation that the same complaining party will be subject to the same action again. *Id.* The party need not show with certainty that the situation will recur, but a mere physical or theoretical possibility is insufficient to overcome the jurisdictional hurdle of mootness. *Id.*

Election issues are among those most frequently saved from mootness by this exception. *See Anderson v. Celebrezze,* 460 U.S. 780, 786–87, 103 S.Ct. 1564, 1568–69, 75 L.Ed.2d 547 (1983); *Storer v. Brown,* 415 U.S. 724, 737 n. 8, 94 S.Ct. 1274, 1282 n. 8, 39 L.Ed.2d 714 (1974); *Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 1494, 23 L.Ed.2d 1 (1969). Elections, including the preelection campaign period, are almost invariably of too short a duration in which to complete litigation and, of course, recur at regular intervals. Van Bergen originally brought his claim to the district court prior to the gubernatorial primary in which he intended to run, but, despite expedited review in the district court, this appeal could not be brought until after the election. The issue of whether Minnesota's limitations of the use of ADADs in an election campaign context passes constitutional muster will never be fully litigated if, at each election, the case becomes moot before appeals can be completed.

In addition, there is a reasonable expectation that Van Bergen's activities, in addition to those of other candidates for elective office, will be limited by the Minnesota statute in the future. As an active politician, and supporter of a program that attracts a small but dedicated segment of the population, there is a reasonable probability that Van Bergen will be in a position to wish to run for office, or promulgate the political program he supports, with the aid of ADAD equipment in the future. Although Van Bergen has not stated with certainty that he will be running

for office again, the probability that he will continue to work to spread his views and influence the outcome of elections is far from merely theoretical. *See Whitton v. Gladstone,* 54 F.3d 1400, 1402 n. 5 (8th Cir.1995); *Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 713, 35 L.Ed.2d 147 (1973) (in finding that the termination of pregnancy did not render abortion case moot, the Court stated that "[p]regnancy often comes more than once to the same woman, and in the general population, if man is to survive it will always be with us"). We find that Van Bergen's challenge to the Minnesota statute is not moot, despite the passing of the specific election campaign in which he attempted to use ADAD equipment.

## 2. Preemption

■ The second threshold issue we must address is Van Bergen's argument that the Minnesota statute is preempted by the Federal Telephone Consumer Protection Act, 47 U.S.C. § 227 (TCPA). The TCPA includes a savings clause:

**(1) State law not preempted**

Except for the standards prescribed under subsection (d) of this section and subject to paragraph (2) of this subsection, nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits—

(A) the use of telephone facsimile machines or other electronic devices to send unsolicited advertisements;

(B) the use of automatic telephone dialing systems;

(C) the use of artificial or prerecorded voice messages; or

(D) the making of telephone solicitations.

47 U.S.C. § 227(e)(1). Van Bergen argues that the Minnesota statute is less restrictive than the TCPA, and is therefore preempted by the TCPA. The savings clause, however, does not state that all less restrictive requirements are preempted; it merely states that more restrictive intrastate requirements are not preempted. The TCPA, therefore,

does not expressly preempt the Minnesota statute.

■ Federal law can preempt state law without an express statement by Congress when the federal statute implies an intention to preempt state law or when state law directly conflicts with federal law. *See New York Conference of Blue Cross v. Travelers Ins.*, — U.S. ——, ——, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995); *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n*, 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983). The TCPA carries no implication that Congress intended to preempt state law; the statute includes a preemption provision expressly not preempting certain state laws. If Congress intended to preempt other state laws, that intent could easily have been expressed as part of the same provision. Further, the preemption provision makes it clear that Congress did not intend to "occupy the field" of ADAD regulation, *see Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 142, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963), or to promote national uniformity of ADAD regulation, as it expressly does not preempt state regulation of intrastate ADAD calls that differs from federal regulation. The congressional findings appended to the TCPA state that "[o]ver half the States now have statutes restricting various uses of the telephone for marketing, but telemarketers can evade their prohibitions through interstate operation; therefore, Federal law is needed to control residential telemarketing practices." 47 U.S.C. § 227, Congressional Statement of Findings (7). This finding suggests that the TCPA was intended not to supplant state law, but to provide interstitial law preventing evasion of state law by calling across state lines.

Finally, the Minnesota statute is not in actual conflict with the TCPA: The Minnesota statute is "virtually identical" to the TCPA, *see Lysaght*, 837 F.Supp. at 648, with two differences. First, the Minnesota statute exempts callers with a prior personal or business relationship, including schools and employers, from the restrictions on ADAD calls, whereas the TCPA exempts only emergency calls. Second, the Minnesota statute applies to calls to both residences and busi-

nesses, whereas the TCPA applies only to residences and specified businesses, such as hospitals. The TCPA, however, includes a mandate to the FCC to prescribe regulations implementing the TCPA, and requires that the FCC:

(A) shall consider prescribing regulations to allow businesses to avoid receiving calls made using an artificial or prerecorded voice to which they have not given their prior express consent;

(B) may, by rule or order, exempt from the requirements of paragraph (1)(B) of this subsection, subject to such conditions as the Commission may prescribe—

(i) calls that are not made for a commercial purpose; and

(ii) such classes or categories of calls made for commercial purposes as the Commission determines—

(I) will not adversely affect the privacy rights that this section is intended to protect; and

(II) do not include the transmission of any unsolicited advertisement. . . .

47 U.S.C. § 227(b)(2). The variations between the TCPA and the Minnesota statute, therefore, are among those variations the FCC is directly authorized to consider: the inclusion of businesses in the locations to which ADAD calls are limited; and the exemption of calls that do not adversely affect privacy rights, among which may be calls from those with whom a prior business or personal relationship exists. It is clear that the Minnesota statute and the TCPA are designed to promote an identical objective, and that there is nothing in the two statutes that creates a situation in which an individual cannot comply with one statute without violating the other.

We find that the TCPA does not expressly preempt state law, nor is it implied in the TCPA that Congress intended to preempt state law, nor does the Minnesota statute conflict with the TCPA. Therefore, the Minnesota statute is not preempted by the TCPA.

### 3. Due Process

■ Van Bergen argues that the statute was amended in violation of a due process

provision of the Minnesota Constitution, and that this constituted a violation of the Fourteenth Amendment.

 Article 4, section 17 of the Minnesota Constitution states that "[n]o law shall embrace more than one subject, which shall be expressed in its title." This rule requires "merely, that all matters treated of should fall under some one general idea...." *Blanch v. Suburban Hennepin Reg. Park D.,* 449 N.W.2d 150, 154–55 (Minn.1989) (quoting *Wass v. Anderson,* 312 Minn. 394, 252 N.W.2d 131, 137 (1977)). The clause functions to provide notice of the interests likely to be affected by a bill to the people and to legislators, and to ensure that the title does not cloak unrelated measures and allow them to be enacted sub rosa. *Wass,* 252 N.W.2d at 135.

The bill in which the amendment to the ADAD statute was enacted was entitled "An Act relating to telecommunications; regulating competitive telephone services and incentive plans; extending expiration dates and making technical changes for certain regulatory provisions; amending Minnesota Statutes 1992, sections ... 325E.26, by adding a subdivision...." Minn. House Bill H.F. 2143.[4] The bill's single general subject was telecommunications, stated in the title. Moreover, the title stated that technical changes would be made in regulatory provisions, and finally, listed the amendment to § 325E.26 in the title itself. The title therefore provided ample notice of the amendment to § 325E.26, and we find that the amendment was enacted in conformity with Article 4, section 17 of the Minnesota Constitution.

### B. First Amendment

Van Bergen contends that the Minnesota statute violates the freedom of speech provision of the First Amendment: He argues that the statute is overbroad; that the statute's limitations on the use of ADADs are content-based; and that the telephone system is not a nonpublic forum, as the government argues. We examine each of these arguments in turn, as we move toward a determination of the proper standard to apply to this regulation.

### 1. Overbreadth

 Van Bergen asserts that the statute is overbroad, and thus that we should examine its impact not only on Van Bergen, but on third parties whose constitutionally protected speech may be inhibited by the limitations on ADAD calls. "This exception from the general rule is predicated on 'a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression,'" *City Council v. Taxpayers for Vincent,* 466 U.S. 789, 799, 104 S.Ct. 2118, 2125, 80 L.Ed.2d 772 (1984) (quoting *Broadrick v. Oklahoma,* 413 U.S. 601, 612, 93 S.Ct. 2908, 2916, 37 L.Ed.2d 830 (1973)), and "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds," *id.* at 801, 104 S.Ct. at 2126.

 In order to support a claim of overbreadth, the party before the court must identify a significant difference between his claim that the statute is invalid on overbreadth grounds, and his claim that it is unconstitutional as applied to his particular activity. *See id.* at 802, 104 S.Ct. at 2127. We can find only a single circumstance in which there may be any difference between this statute as applied to Van Bergen, and this statute as applied to third parties. The statute limits all ADAD calls to between 9 a.m. and 9 p.m., and also limits live commercial solicitation calls to the same hours. This limitation is not applied to live noncommercial calls, but, otherwise, the statute makes no distinction between commercial and noncommercial speech. *See* part 2, *infra.* This time restriction is far from sufficiently significant to support an overbreadth claim: First, it is a minor restriction, given that the value of commercial solicitation calls outside those hours is low, since people are likely to be unreceptive to calls that come when they are

---

4. We note that appellant's brief is less than honest regarding both the content and the punctuation of this title.

sleeping; second, there is no reason why a commercial telephone solicitor cannot bring this specific claim before the court for adjudication as applied. This single limitation is unlikely to cause commercial telephone solicitors to refrain from speech independently of the provisions applied to Van Bergen, and litigated in this case.

Van Bergen's claim differs from the potential claims of third parties only in one minor aspect, and we believe that it would be more appropriate for an affected party to litigate that aspect of the statute.

We limit our review of the statute to the case before us, and analyze it as applied to Van Bergen's campaign ADADs.

## 2. Content–Neutrality

 It is well settled that "government may impose reasonable restrictions on the time, place or manner of engaging in protected speech provided that they are adequately justified 'without reference to the content of the regulated speech.'" *Cincinnati v. Discovery Network, Inc.,* —— U.S. ——, ——, 113 S.Ct. 1505, 1516, 123 L.Ed.2d 99 (1993) (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. at 2753). On the other hand, "if a governmental regulation is based on the content of the speech or the message, that action must be scrutinized more carefully to ensure that communication has not been prohibited 'merely because public officials disapproved the speaker's view.'" *U.S. Postal Serv. v. Greenburgh Civic Ass'ns,* 453 U.S. 114, 132, 101 S.Ct. 2676, 2686–87, 69 L.Ed.2d 517 (1981) (upholding federal statute prohibiting the placing of unstamped mail in mailboxes). Our initial inquiry, therefore, is whether the Minnesota ADAD statute is content-neutral.

The statute defines a "caller" broadly as any person or entity who uses a telephone or telephone line to contact or to try to contact a telephone subscriber. Minn.Stat. § 325E.26 subd. 3. The central provision in the statute, restricting use of ADADs to situations in which the subscriber has consented to receipt of the message or in which the ADAD message is preceded by a live operator who obtains consent to the playing of the message, applies to all callers, with three exceptions. The three exceptions are for: messages to subscribers with whom the caller has a current business or social relationship; messages from schools for parents, students, or employees; and messages to employees advising them of work schedules. Minn.Stat. § 325E.27. Under the 1994 amendment to the statute, messages are defined as including any call, regardless of its content. Minn.Stat. § 325E.26 subd. 6. The exceptions exempt certain groups from the restrictions, not on the basis of the content of their message, but on the basis of their relationship with the subscriber.[5] *See Ward,* 491 U.S. at 791, 109 S.Ct. at 2754. ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is *'justified* without reference to the content of the regulated speech.'" (quoting *Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984) (emphasis added) (internal citations omitted))).

Not only are the three exceptions based on relationship rather than content, but the exceptions also all rest on a single premise: that the caller has a relationship with the subscriber implying the subscriber's consent to receive the caller's communications. Any caller can contact any subscriber with an ADAD if the subscriber has consented to be contacted. By establishing a business, social, or educational relationship with a potential caller, the subscriber is implying consent to communicate back and forth with the caller; these relationships generally involve series of communications that can be carried out either through the mail or on the telephone. The statute allows any caller to contact any

---

5. The third exception, while it is content-based on its face, fails to limit the content of employers' messages to employees in light of the broad exception for subscribers with whom the caller had a current business relationship. It seems obvious to us that an employer has a current business relationship with an employee, and thus can avail himself of the first exception to contact his employees for any purpose, regardless of the third exception. The third exception, thus, has no content-restricting effect. Further, the third exception bears no relation to the statute's application to Van Bergen.

subscriber by ADAD providing that the caller has obtained the subscriber's consent. The three exceptions merely identify groups of subscribers that perforce already have consent to contact the subscriber, and who do not have to go through the formality of obtaining additional specific consent to satisfy the statute.

Moreover, if the subscriber does not wish a caller with whom he has a current relationship to contact him by ADAD, he has the opportunity to inform the caller of this preference. Subscribers have no opportunity to inform strangers contacting them by ADAD that they prefer not to be contacted by ADAD.

Minn.Stat. § 325E.27 is therefore content-neutral. All callers, whatever the content of their messages may be, must have either the express or the implied consent of the subscriber, or consent obtained through a live operator, to deliver an ADAD message. In addition, the exempted groups are defined by their relationship to the caller, not by the content of their messages.

Sections 325E.28 and .29 both apply to all callers and all messages, and are content-neutral. Section 325E.30 prohibits all callers, delivering any message, from using ADADs before 9 a.m. and after 9 p.m. It additionally prohibits any commercial solicitation, whether live or by ADAD, during those same hours. Even assuming, without deciding, that this single provision is content-based, it does not apply to Van Bergen and is not before the court in this case. Commercial solicitation is defined as soliciting the purchase or the consideration of purchase of goods or services. Van Bergen asserts that

his proposed ADAD campaign contained no solicitation of any kind, but merely an offer of further information to be obtained by calling a toll-free number. Van Bergen also asserts that the statute violates his right to receive calls, but has made no showing of any kind that the limitation of live commercial calls to the daytime hours has had any effect on the flow of information into his home or office. The commercial solicitation provision had no effect whatsoever on Van Bergen, and we will not review it in this context.

■ Finally, Van Bergen argues that the list of nonprofit organizations, Minn.Stat. § 290.21 subd. 3(a)–(e), is exempted from the statute's limitations on ADAD calls, and that this results in a content-based regulation. Calls by the list of organizations are exempted from the definition of commercial solicitation, not from the definition of caller, and "commercial solicitation" appears only in the part of the statute prohibiting calls before 9 a.m. and after 9 p.m. *See* Minn.Stat. §§ 325E.26 subd. 4, 325E.30. Therefore, these organizations are exempted only from the blanket prohibition of commercial solicitation during the nighttime hours, not from the provisions that apply to Van Bergen, and the exemption does not render the statute content-based as applied to Van Bergen.[6]

We find that the statute, as applied to Van Bergen, is content-neutral, limiting not the content of telephone communications, but the time and manner in which they may be made.

**3. Forum**

■ "[T]he standards by which limitations on speech must be evaluated 'differ depending on the character of the property at issue.'" *Frisby v. Schultz*, 487 U.S. 474, 479, 108 S.Ct. 2495, 2500, 101 L.Ed.2d 420 (1988) (quoting *Perry Educ. Ass'n v. Perry*

---

6. Van Bergen asserts, in addition to the claims discussed at length in this opinion, that the statute is unconstitutionally vague, that it violates his Fourteenth Amendment equal protection rights, and that it is a prior restraint on speech. Our discussion of content-neutrality should make it apparent that (1) the statute is quite straightforward and clear, defining "caller," "message," and "commercial solicitation," separately, and using each term to indicate the scope of each provision of the statute; (2) the statute's impact extends to all ADAD callers, exempting only those with a current relationship with the recipient of the call, who are not similarly situated to

Van Bergen; (3) the statute is not a prior restraint, but a restriction on otherwise protected speech: "A frequent pitfall of both courts and commentators is to employ the doctrine [of prior restraint] in cases involving expression clearly within the first amendment guarantees, in ignorance of the fact that '[w]here the speech in question is in all events guaranteed by the First Amendment, attributing that guarantee to the circumstance of prior restraint is at best irrelevant and often misleading.'" Lawrence H. Tribe, *American Constitutional Law*, 1041 (1988) (quoting Jeffries, *Rethinking Prior Restraint*, 92 Yale L.J. 409, 411 (1982)).

*Local Educators' Ass'n,* 460 U.S. 37, 44, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983)). Publicly-owned property or channels of communication are categorized into three types of fora: the traditional public forum, the public forum created by government designation, and the nonpublic forum.[7] *Id.* at 479–80, 108 S.Ct. at 2499–2500.

■■■ The government argues, citing *Cornelius v. NAACP Legal Def. & Educ. Fund,* 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), and *Perry,* 460 U.S. 37, 103 S.Ct. 948, that the nonpublic forum standard should apply in this case. We disagree. Both *Perry* and *Cornelius* concerned situations in which the government excluded certain entities from participation in the government-created and -owned nonpublic forum on the grounds that the forum was created by the government with the specific purpose of entertaining only limited subject matters.

Although closely regulated by the government, the telephone system remains privately-created, -owned and -operated, and the nonpublic forum analysis has not been extended to include privately-created and -owned entities, even when heavily regulated.[8] In *Turner Broadcasting Sys., Inc. v. F.C.C.,* —— U.S. ——, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994), the Court did not apply the nonpublic forum standard to a First Amendment challenge to the Cable Television Consumer Protection and Competition Act of 1992. Instead, the Court rejected the relaxed First Amendment review applied to broadcast television as inappropriate to cable television,[9] and applied the "intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech." *Id.* at ——, 114 S.Ct. at 2469 (citing *Ward,* 491 U.S. 781, 109 S.Ct. 2746; *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968)). *See also Consolidated Edison Co. of New York v. Public Serv. Comm'n of New York,* 447 U.S. 530, 539–40, 100 S.Ct. 2326, 2334, 65 L.Ed.2d 319 (1980) (public utility's billing envelopes not a nonpublic forum in which the government can freely restrict speech); *Pacific Gas & Elec. Co. v. Public Util. Comm'n,* 475 U.S. 1, 17, 106 S.Ct. 903, 912, 89 L.Ed.2d 1 (1986) (public utility's billing envelopes are the utility's property, and government cannot require utility to distribute information in its billing envelopes). The cable system and privately-owned public utilities are at least as heavily regulated as the telephone network, but are nevertheless treated as private entities, not nonpublic fora, for First Amendment purposes. We find that the telephone system is not a nonpublic forum, because it is a privately-created, -owned and -operated entity.[10] In the instant case, the government is

---

7. "At one end of the spectrum are streets and parks which 'have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'" *Perry,* 460 U.S. at 45, 103 S.Ct. at 954–55 (quoting *Hague v. CIO,* 307 U.S. 496, 515, 59 S.Ct. 954, 964, 83 L.Ed. 1423 (1939)). "A second category consists of public property which the State has opened for use by the public as a place for expressive activity." *Id.* The third category is "[p]ublic property which is not by tradition or designation a forum for public communication [and] is governed by different standards. We have recognized that the 'First Amendment does not guarantee access to property simply because it is owned or controlled by the government.'" *Id.* at 46, 103 S.Ct. at 955 (quoting *Greenburgh,* 453 U.S. at 129, 101 S.Ct. at 2685).

8. The exception is private corporations created by the government. *See Lebron v. National R.R. Passenger Corp.,* —— U.S. ——, 115 S.Ct. 961, 130 L.Ed.2d 902 (1995). The telephone system is not government-created.

9. In differentiating between cable and broadcast television, the Court noted that: "Our decisions have recognized that the special interest of the Federal government in regulation of the broadcast media does not readily translate into a justification for regulation of other means of communication." *Id.* at ——, 114 S.Ct. at 2457 (quoting *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 74, 103 S.Ct. 2875, 2884, 77 L.Ed.2d 469 (1983)). The Court further noted that cable systems make connections between transmitter and television by cable or optical fibers "much like telephone companies." *Id.* at ——, 114 S.Ct. at 2451.

10. The Supreme Court recently reiterated the limitation of forum analysis to government property only:
These cases [discussing nonpublic fora] reflect, either implicitly or explicitly, a "forum-based" approach for assessing restrictions that the government seeks to place on the use of its property. Under this approach, regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny. Such regulations survive only if they are narrowly drawn to achieve a compelling state interest. The

regulating speech in a private context, and the rationale supporting the standard applied in *Perry* and *Cornelius* does not apply.

The district court found that the telephone system is a limited public forum. In addition to being privately-owned, the system has none of the hallmarks of a public forum. Although telephones are used for fundraising, polling, and other activities that might be described as "public," the government has never invited these activities onto the telephone system in the way that the government invites public activity when it establishes, for example, a university. The classic public fora—streets and parks—are traditional gathering places in which public debate and exchange of views take place. The telephone system, at least at this time, is not primarily a conduit for public forum activity. The primary use of the telephone is for personal business, family and social activities, and the telephone is primarily a device for private communication between only two persons at a time.

We find that for First Amendment purposes, the telephone system is neither a public property nonpublic forum, nor a limited public forum, but a private channel of communication.

### 4. Time, Place or Manner Restriction

 We examine the Minnesota statute as a content-neutral time, place or manner restriction on speech made through private channels for the purpose of reaching private residences and offices, and apply the intermediate level of scrutiny applicable to content-neutral restrictions that impose an incidental burden on speech:

> Expression, whether oral or written or symbolized by conduct, is subject to reasonable time, place, or manner restrictions. We have often noted that restrictions of this kind are valid provided that they are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information.

*Clark,* 468 U.S. at 293, 104 S.Ct. at 3069; *see O'Brien,* 391 U.S. at 377, 88 S.Ct. at 1679; *Ward,*[11] 491 U.S. at 791, 109 S.Ct. at 2753; *Turner Broadcasting,* —— U.S. at ——, 114 S.Ct. at 2469.

 Having determined that the Minnesota statute is content-neutral, we now examine the statute to determine if it is "narrowly tailored to serve a significant government interest, and [if it] leave[s] open ample alternative channels for communication of the in-

second category of public property is the designated public forum, whether of a limited or unlimited character—property that the state has opened for expressive activity by part or all of the public. Regulation of such property is subject to the same limitations as that governing a traditional public forum. Finally, there is all remaining *public* property. Limitations on expressive activity conducted on this last category of property must survive only a much more limited review. The challenged regulation need only be reasonable, as long as the regulation is not an effort to suppress the speaker's activity due to disagreement with the speaker's view.

*International Soc. for Krishna Consciousness v. Lee,* —— U.S. ——, —— – ——, 112 S.Ct. 2701, 2705–06, 120 L.Ed.2d 541 (1992) (emphasis added).

11. *Ward* and *Clark* both concerned free speech rights in public parks, which are public fora. A private forum, such as a residence or office, or privately-owned telecommunications system, is more akin to a public forum than to a public property nonpublic forum for purposes of government regulation, and the same standard is logically applied to both. The rationale behind the extremely lenient standard applied to public property nonpublic fora is that they are government-created entities, and the government therefore has the prerogative of delineating the parameters of the forum it has created. In traditional public fora, the government may only apply time, place or manner restrictions because these fora have traditionally been the province of those who wish to speak freely in discourse with others. In private fora, the government is similarly permitted only to apply time, place or manner restrictions because these fora are presumptively the province of those who own and occupy them, and the choice of what speech to permit and what to reject is the private property owner's, not the government's. *See Martin v. Struthers,* 319 U.S. 141, 148, 63 S.Ct. 862, 866, 87 L.Ed. 1313 (1943).

The intermediate level of scrutiny applied in *Ward* and *Clark* also closely resembles the test applied to regulations that restrict solely commercial speech. *See Florida Bar v. Blakely,* —— U.S. ——, ——, 115 S.Ct. 2371, ——, 132 L.Ed.2d 541 (1995) (applying *Central Hudson* test to regulation restricting attorneys' commercial speech).

formation." *Ward,* 491 U.S. at 781, 109 S.Ct. at 2749 (internal quotations omitted).

■ Residential privacy is a significant government interest. "Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different. . . . [A] special benefit of the privacy all citizens enjoy within their own walls, which the State may legislate to protect, is an ability to avoid intrusions." *Frisby,* 487 U.S. at 484–85, 108 S.Ct. at 2502. " 'The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society.' " *Id.* at 484, 108 S.Ct. at 2502 (quoting *Carey v. Brown,* 447 U.S. 455, 471, 100 S.Ct. 2286, 2296, 65 L.Ed.2d 263 (1980)). "The First Amendment permits the government to prohibit offensive speech as intrusive when the 'captive' audience cannot avoid the objectionable speech." *Id.* at 487, 108 S.Ct. at 2504.

Van Bergen complains that the government failed to provide affidavits relating to the disruption caused by ADAD calls in the home, asserting that all of the affidavits [12] offered by the government pertained to disruptions caused by ADADs in a business setting. The government, however, presented affidavits regarding the high volume of complaints received about ADAD calls at the Attorney General's office from both residential and business sources. *See* Aff. of Amy Finken. Moreover, we do not believe that external evidence of the disruption ADAD calls can cause in a residence is necessary: It is evident to anyone who has received such unsolicited calls when busy with other activities.

The efficient conduct of business operations also is a significant government interest. States are dependent on the operation of business for their tax revenues, and have an interest in promoting and protecting productivity of private business. Moreover, individuals at work in private businesses are entitled to expect that they will not be disturbed except by personal or business invitees, just as, at their residence, they are entitled to expect privacy. *Cf. Mancusi v. DeForte,* 392 U.S. 364, 369, 88 S.Ct. 2120, 2124, 20 L.Ed.2d 1154 (1968) (holding that the occupant of an office has standing to challenge warrantless search of his office because entitled to expect only invitees to enter his office).

ADAD calls are uniquely intrusive due to the machine's inability to register a listener's response. In *Martin v. Struthers,* the Court held that the government's interest in residential privacy did not outweigh the right of door-to-door pamphleteers largely on the grounds that the householder should make the choice of whether to listen to the pamphleteer's message or not. 319 U.S. 141, 147–48, 63 S.Ct. 862, 865–66, 87 L.Ed. 1313 (1943). The Court suggested that the householder's interests would be better preserved by the householder exercising his right to indicate that he is unwilling to be disturbed, and by making it an offense to knock or ring at a door with such an indication. This, the Court reasoned, leaves the decision whether to retain privacy with the individual householder. *Id.* at 148, 63 S.Ct. at 866. The Court emphasized the prevalence of laws that enforce the householder's right to post an indication that solicitors or pamphleteers are not welcome and to have that indication honored. *Id.* Householders therefore can entirely avoid in-person door-to-door solicitors or information distributors if they simply post a sign on the door to which the individual door-to-door speaker can respond. Similarly, in *Rowan v. Post Office Dep't,* the Court upheld a statute allowing recipients of advertising mail they found sexually offensive to notify the Postmaster General, who would then require that the sender cease sending mail of any kind to that recipient. 397 U.S. 728, 734, 90 S.Ct. 1484, 1489, 25 L.Ed.2d 736 (1970). The statute was upheld in part because it "was intended to allow the addressee complete and unfettered discretion in electing whether or not he desired to receive further material from a particular sender." *Id.* The Court explained that "[i]n today's complex society we are inescapably captive audiences for many purposes, but a

---

**12.** We do not include the Lokke affidavit as part of the evidence in this case. Van Bergen asserts that he was not provided with Lokke's address and was unable, as a result, to serve her a subpoena for the purposes of cross-examination regarding her affidavit. We make no finding or decision regarding the validity of the Lokke affidavit.

sufficient measure of individual autonomy must survive to permit every householder to exercise control over unwanted mail." *Id.* at 736, 90 S.Ct. at 1490.

Telephone calls from a live operator are more disruptive than door-to-door solicitors warned not to disturb, because the recipient must respond once to each caller. When the call is made by a live operator, however, the recipient has the opportunity to tell the operator, at any point in the conversation, that he does not want to hear from the calling person or entity again. An ADAD does not offer the recipient the option of cutting off the calls; it does not offer householders a choice of whether to respond to the speaker or not. The ADAD recipient may hang up as soon as the message starts, but has no opportunity to tell the machine that he does not want it to call again, and may be obliged, against his will, to respond over and over to the same unwanted caller. *See* 47 U.S.C. § 227, Congressional Statement of Findings (3) ("More than 300,000 solicitors call more than 18,000,000 Americans every day."); *Vincent,* 466 U.S. at 809–10, 104 S.Ct. at 2131–32 (explaining distinction between protected distribution of leaflets by "individual citizens ... actively exercising their right to communicate directly with potential recipients of their message," who perforce remained on the scene while engaging in speech, and the unprotected posting of signs "throughout an area where they would remain unattended until removed").

The sheer quantity of telemarketing calls further supports the government's interest in regulation protecting privacy. In *Breard v.*

*Alexandria,* an ordinance permitted door-to-door commercial solicitations only with the prior consent of the householder. 341 U.S. 622, 624–25, 71 S.Ct. 920, 923, 95 L.Ed. 1233 (1951). The Court in part justified its decision to uphold the ordinance by citing the increase in door-to-door solicitations: "Door-to-door canvassing has flourished increasingly in recent years with the ready market furnished by the rapid concentration in housing. The infrequent and still welcome solicitor to the rural home became to some a recurring nuisance in towns when the visits were multiplied." *Id.* at 626, 71 S.Ct. at 924. Telemarketing calls, similarly, are flourishing, and becoming a recurring nuisance by virtue of their quantity.

■ Because ADAD calls intrude upon the privacy and tranquility of the home and the efficiency of the workplace, and because the recipient has no opportunity to indicate the desire not to receive such calls,[13] we find that the government has a substantial interest in limiting the use of unsolicited, unconsented-to ADAD calls.[14]

The statute is narrowly tailored to reach these interests. The statute does not "foreclose an entire medium of expression," *see City of Ladue v. Gilleo,* —— U.S. ——, ——, 114 S.Ct. 2038, 2045, 129 L.Ed.2d 36 (1994), and the limits on ADAD calls are designed to remedy the problems perceived with the liberal use of ADAD technology.

Although the use of ADADs is strictly limited, the prior consent and live operator options both allow the continued use of ADADs while protecting the right of the

---

**13.** We note that there was some discussion in the briefs and at oral argument concerning possible ways in which recipients might be able to indicate their preference not to receive ADAD calls, including ADAD blockers for telephones and a database of persons who do not wish to receive ADADs. We imagine, too, that ADAD calls could be programmed to include an automated consent option at the outset of the call. To be narrowly tailored, however, time, place or manner restrictions need not apply the least restrictive means of achieving the government interest:

The Court of Appeals erred in sifting through all the available or imagined alternative means of regulating sound volume in order to determine whether the city's solution was 'the least intrusive means' of achieving the desired end. This 'less-restrictive-alternative analysis ... has never been a part of the inquiry into the

validity of a time, place, and manner regulation.' *Regan v. Time, Inc.,* 468 U.S. 641, 657 [104 S.Ct. 3262, 3271, 82 L.Ed.2d 487] (1984) (opinion of White, J.). Instead, our cases quite clearly hold that restrictions on the time, place, or manner of protected speech are not invalid 'simply because there is some imaginable alternative that might be less burdensome on speech.' *United States v. Albertini,* 472 U.S. 675, 689 [105 S.Ct. 2897, 2906, 86 L.Ed.2d 536] (1985).

*Ward,* 491 U.S. at 797, 109 S.Ct. at 2757.

**14.** Van Bergen suggests that the Attorney General "interpreted" the statute to apply to him for political motives. As discussed in note 6, *supra,* we find the statute's text to be quite clear in its application to Van Bergen.

recipient to choose whether or not to receive a message. Van Bergen contends that the live operator option was prohibitively expensive and difficult to organize; a live operator running a series of ADADs, however, would be far more efficient than a live operator both making the calls and delivering the entire message. An ADAD operator need only announce the source of the call and ask if the listener wishes to hear the message; the operator, after receiving the response, can immediately move on to the next call, leaving the ADAD to continue with the previous caller.

The consent or live operator requirement will also give recipients an opportunity not only to decline to listen to the message at that time, but also to request that the caller not call again. The recipient thus can gradually reduce the total number of ADAD calls he receives, remedying the interruption of his business or leisure activities.

Finally, there are ample alternative channels for communication. ADADs are a new technology, and people have been campaigning for elective office, soliciting for charities, spreading religious messages, and selling products for centuries without the benefit of these machines. ADADs can still be used with the aid of a live operator. This should be only a marginally more costly option. Live telephone calls, door-to-door distribution of information, street corner leafletting, posters and signs, and bulk mailings are all inexpensive and effective options, especially in the case of a political campaign, where personal interaction is likely to be more effective than an ADAD message, and the venerable tradition of volunteer support aids in limiting expenses. *See Ladue,* —— U.S. at —— n. 16, 114 S.Ct. at 2046 n. 16 (venerable tradition and low cost of residential posting of campaign signs militate in favor of striking down ordinance banning them).

In summary, we find that the Minnesota ADAD statute meets the requirements of a time, place or manner regulation of protected speech. The government is advancing a substantial interest in citizens' residential privacy and business efficiency, which is justified without reference to the content of the speech; the statute is narrowly tailored to advance this interest and leaves open ample alternative channels of communication.

### III. CONCLUSION

Because we find that the Minnesota statute regulating ADAD calls, as applied to Van Bergen, is a valid time, place or manner restriction on speech, we affirm the district court's dismissal of Van Bergen's application for declaratory and injunctive relief.