In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 11-3265

PATRIOTIC VETERANS, INC.,

*Plaintiff-Appellee,*

*v.*

STATE OF INDIANA, *et al.,*

*Defendants-Appellants.*

_____

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:10-cv-00723-WTL-TAB — **William T. Lawrence**, *Judge.*

_____

ARGUED JANUARY 20, 2012 — DECIDED NOVEMBER 21, 2013

_____

Before FLAUM, AND ROVNER, *Circuit Judges* and CASTILLO, *District Judge.*[*]

ROVNER, *Circuit Judge*. Legislators in the State of Indiana believe that the bulk of its citizens find automated telephone messages to be an annoyance, and one worthy of government protection. These types of telephone calls are made by

_____

[*] Of the Northern District of Illinois, sitting by designation.

an automatic dialing-announcing device that (according to Indiana's definition) selects and dials telephone numbers and disseminates a prerecorded or synthesized voice message to the telephone number called. *See* Ind. Code § 24–5–14–1. In common parlance these calls are often referred to as "robocalls."

This hunch about robocalls is backed by empirical data. From January 1, 2002, until September 30, 2010, the Attorney General of Indiana fielded 27,577 valid complaints under the State's Telephone and Privacy Act and Autodialer Law.[1] Between January 1, 2009 and September 30, 2010,more than half of the 8,799 valid Telephone Privacy Act complaints made to the Attorney General of Indiana reported the use of autodialers. *Id.* Similarly, the Federal Trade Commission fields over 200,000 complaints about automated marketing or "autodialer" calls every month.[2] In 2012, the Federal Trade Commission offered a $50,000 reward to any person who could come up with a solution to stopping these un-

---

[1] A valid complaint is one that alleges facts which describe a possible violation of the Telephone Solicitation of Consumers Act or the Regulation of Automatic Dialing Machines Act or both and contains sufficient information to conduct an investigation. Declaration of Marguerite M. Sweeny, Section Chief of Telephone Privacy Section for the Office of the Attorney General of the State of Indiana. Appellant's Separate Appendix at 44–46.

[2] Fed. Trade Comm'n, "FTC Leads Joint Law Enforcement Effort Against Companies That Allegedly Made Deceptive 'Cardholder Services' Robocalls." Nov. 1, 2012. Available at http://www.ftc.gov/opa/2012/11/ robocalls.shtm. Last accessed October 30, 2013.

wanted calls. Robocall Challenge, 77 Fed. Reg. 64802–01 (Oct. 23, 2012).

Indiana's attempt to protect its citizens from these phone calls resulted in the enactment of the state's Automated Dialing Machine Statute, which bans these autodialed calls unless the receiver has consented to the calls in some manner before the automated message is delivered. Ind. Code § 24–5–14–1 through § 24–5–14–13. There are some very limited exemptions—for example, school districts may send messages to students and parents, and employers may send messages to employees—but there is no exception for political calls. Ind. Code § 24–5–14–5(a). The Attorney General of Indiana may enforce the Autodialer Law by imposing various penalties including, among others, injunctions against future violations, suspension of business certificates, the voiding of contracts, and fines. Ind. Code §§ 24–5–0.5–4(c), 24–5–0.5–4(g).

The heart of Indiana's statute reads as follows:

> (b) A caller may not use or connect to a telephone line an automatic dialing-announcing device unless:
>
>> (1) the subscriber has knowingly or voluntarily requested, consented to, permitted, or authorized receipt of the message; or
>>
>> (2) the message is immediately preceded by a live operator who obtains the subscriber's consent before the message is delivered.

Ind. Code § 24–5–14–5.

But for the Indiana statute, the appellant, Patriotic Veterans, Inc., would make calls in Indiana.[3] Patriotic Veterans, Inc. is a not-for-profit Illinois corporation whose purpose is to inform voters of the positions taken by the candidates and office holders on issues of interest to veterans. In disseminating this information, Patriotic Veterans uses automatically dialed phone calls that deliver a political message related to a particular candidate or issue. For example, Patriotic Veterans' website states that "in 2010, Patriotic Veterans, in partnership with singing idol Pat Boone sponsored nearly 1.9 million calls to veterans and seniors across the U.S. about cuts in Medicare as a result of the passage of Obamacare." http://www.gravideo.com/patrioticveterans/what.html (last visited June 1, 2013). The service Patriotic Veterans uses to disseminate its message is capable of delivering as many as 100,000 messages in a three hour period. Patriotic Veterans maintains that it cannot afford to hire operators to make the phone calls without the use of an automatic dialer and a recorded message, as the cost of doing so is eight times higher than using an automatic dialing service. The group also maintains that live operators cannot make calls fast enough when time is of the essence—such as on the eve of an election.

---

[3] The district court refused to stay its injunction prohibiting the State of Indiana from enforcing the law pending appeal. *Patriotic Veterans, Inc. v. Indiana*, No. 1:10-cv-723-WTL-TAB (S.D. Ind. Dec. 13, 2011) (order denying Defendant's Motion to Stay Enforcement of the Judgment Pending Resolution of the Appeal). This court, however, later stayed the district court's injunction pending appeal. *Patriotic Veterans, Inc. v. Indiana*, No. 11-3265 (7th Cir. Dec. 21, 2011) (granting Defendant/Appellants' Motion for Stay Pending Appeal).

Consequently, Patriotic Veterans filed a complaint against the State of Indiana and Attorney General Greg Zoeller seeking a declaration that the Indiana law is invalid as it violates the First Amendment, at least as it applies to political messages, and is also preempted by the Federal Telephone Consumer Protection Act (TCPA), 47 U.S.C. § 227.

That federal law, the TCPA, represents Congress's attempts to address similar concerns about the deleterious effects of telemarketing and telephone solicitations, particularly automated calls. *See* S. Rep. No. 102–178, *reprinted in* 1991 U.S.C.C.A.N. 1968. The TCPA regulates various telemarketing behaviors and includes, among other things, regulations on the uses of autodialers. It prohibits calls to a residential telephone line using an artificial or prerecorded voice without the recipient's prior express consent, "unless the call is initiated for emergency purposes or is exempted by rule or order by the [Federal Communications] Commission under paragraph 2(B)." 47 U.S.C. § 227 (b)(1)(B). Under paragraph 2(B), the FCC is authorized to exempt calls that are not made for a commercial purpose, 47 U.S.C. § 227(b)(2)(B)(i), and the FCC has used its authority to exempt non-commercial calls in the following manner:

(a) No person or entity may …

(3) Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party, unless the call; … (ii) Is not made for a commercial purpose.

47 C.F.R. § 64.1200(a)(3)(ii)(2005).

In passing the TCPA, Congress particularly noted that over forty states had enacted legislation limiting the use of autodialers, but that "[m]any states have expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls." *See* S. Rep. No. 102–178, at 2–3, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1970. In reaching this conclusion, the Congressional statement assumed that the states did not have jurisdiction over interstate calls—an assumption we will explore further below.

Both parties moved for summary judgment—an appropriate adjudicative procedure where the parties agree that none of the relevant facts are in dispute and the resolution hinges solely on an issue of law. *See* Fed. R. Civ. P. 56; *Berry v. Chicago Transit Auth.*, 618 F.3d 688, 691 (7th Cir. 2010). In this case, those issues of law include first, whether the Indiana statute is preempted by federal law, and second, whether the statute violates the First Amendment of the United States Constitution.

The district court found that the TCPA preempted Indiana's statute as it applies to the interstate use of autodialers and granted Patriotic Veterans' request for an injunction against the enforcement of the regulation with regard to political messages. *Patriotic Veterans, Inc. v. Indiana*, 821 F. Supp. 2d 1074, 1079 (S.D. Ind. 2011). Because it found that the statute was preempted, the district court properly declined to rule on the First Amendment question. Upon a motion from the state, this court stayed the district court's injunction pending appeal. *See supra*, note 3. We review the district court's summary judgment decision pertaining to preemp-

tion de novo. *Ramos v. City of Chicago,* 716 F.3d 1013, 1014 (7th Cir. 2013).

In keeping with our mandate to address statutory issues before constitutional ones (*see Jean v. Nelson,* 472 U.S. 846, 854 (1985); *Ameritech Corp. v. McCann*, 403 F.3d 908, 911 (7th Cir. 2005)), we look first at the issue of preemption. In determining whether a federal statute preempts state law we begin, as we always must, with the intent of Congress. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). We ascertain the intent of Congress, however, through a lens that presumes that the state law has not been preempted. *Id*. We do this because, given the historic police powers of the states, a court must assume that Congress did not intend to supersede those powers unless the language of the statute expresses a clear and manifest purpose otherwise. *Id.* at 565. *Altria Group v. Good*, 555 U.S. 70, 77 (2008); *Arizona v. U.S.,* 132 S. Ct. 2492, 2501 (2012), *cert. denied*, 133 S. Ct. 2736 (2013); *Gregory v. Ashcroft*, 501 U.S. 452, 460–461 (1991). Thus, when the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors pre-emption." *Altria Group*, 555 U.S. at 77. In this case, it is clear that the states historically have held the power to police harassing telephone calls. *See, e.g.* 720 ILCS 5/26.5–2; Ind. Code § 35–45–2–2; Wisconsin Stat. § 947.012(1)(a). Likewise, states and localities historically have policed activities that violate the peaceful enjoyment of the home. *See Frisby v. Schultz*, 487 U.S. 474, 484–485, (1988); *Watchtower Bible and Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 162–163 (2002); *FCC v. Pacifica Found.*, 438 U.S. 726, 748–749 (1978)

Thus, given our directive to look at the intent of Congress with a presumption of non-preemption, the first place to look for Congress's intent is in the TCPA's preemption clause (also called a savings clause) which states in relevant part:

(f)  Effect on State law

    (1)  State law not preempted

> … nothing in this section or in the regulations prescribed under this section shall preempt any State law that imposes more restrictive intrastate requirements or regulations on, or which prohibits …
>
> (B)   the use of automatic telephone dialing systems;
>
> (C)   the use of artificial or prerecorded voice messages;

47 U.S.C. § 227(f)(1).

As the district court noted, if the savings clause is read as written, the savings clause would apply to and prevent preemption of (1) state laws that impose more restrictive *intrastate* requirements or regulations on the use of automatic telephone dialing systems; and (2) state laws which prohibit the use of automatic telephone dialing systems (both intra- and interstate). *Patriotic Veterans*, 821 F. Supp. 2d at 1078.

The district court found this to be an odd result, for, on its face, it appears that it would not apply to any state law that imposes more restrictive *interstate* requirements or regulations on the use of automatic telephone dialing systems, only *intrastate* regulations, thus protecting a state's ability to

prohibit conduct altogether but not its ability to place restrictions on it. *Id*. Because the district court felt this was a perplexing result, it concluded that it must look elsewhere for evidence of Congressional intent. *Id.*

Even were this an odd result (and as we explore later, we do not believe that it is), the court's job is not to fix it. The "preeminent canon of statutory interpretation" requires that courts "presume that [the] legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd. v. U.S.,* 541 U.S. 176, 183 (2004) (quoting *Connecticut Nat'l Bank v. Germain,* 503 U.S. 249, 253–54 (1992)). If Congress determines later that the plain language of the statute does not accurately reflect the true intent of Congress, it is for Congress to amend the statute. *See Dodd v. U.S.,* 545 U.S. 353, 359–360 (2005). The court's task is not to seek a motive for what Congress has plainly done, in fact, to the contrary, a court must "avoid rendering what Congress has plainly done … devoid of reason and effect." *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 217–218 (2002). If Congress had intended, therefore, that the second part of the savings clause apply only to the intrastate clause it could simply have said that. *North Dakota v. FreeEats.com*, 712 N.W.2d 828, 834 (ND 2006) (analyzing substantially similar state statute and quoting *Great-West Life and Annuity Ins. Co.*, 534 U.S. at 218 for this conclusion). As it stands, the plain language of the statute decrees that state laws that prohibit autodialers are not preempted by the statute.

Although the district court conceded that a facial reading of the statute seemed to indicate that the TCPA does not preempt Indiana's autodialer statute, Patriotic Veterans goes one step farther and argues that the plain language of the

Indiana statute expressly preempts the state statute. It does so by arguing that the word "intrastate" somehow modifies "requirements or regulations" as well as the phrase "or which prohibits." Patriotic Veterans concedes, as it must, that such a reading is "not grammatically perfect." It is not only imperfect, but irrational. This is why, perhaps, Patriotic Veterans abstractly describes the roles of "that" and "which" and "restrictive clauses" and "non-restrictive clauses" without ever showing us how it would change the language of the statute to make it work in a way that Patriotic Veterans says it does. This is because there is no rational way to re-arrange the language to make it say what the veterans would like it to say. The TCPA does not expressly preempt the Indiana statute.

The district court concluded instead that Indiana's statute, by exempting certain entities and types of calls, merely regulated autodialers and did not prohibit them, and therefore did not fall into the expressly saved category of statutes that "prohibit[] … the use of automatic telephone dialing systems." 47 U.S.C. § 227(f)(1). Indiana's statute, however, does appear to be a prohibition—it prohibits automatic dialing devices unless consent is first obtained. There are indeed other enumerated exemptions to the statute, but each describes a form of implied consent: Autodialers may be used to make calls "(1) from school districts to students, parents, or employees; (2) to subscribers with whom the caller has a current business or personal relationship; or (3) advising employees of work schedules." Ind. Code § 24–5–14–5. By accepting a job, an employee impliedly consents to phone calls from his employer for work related scheduling purposes, as do families who enroll children at school or people who enter into business relationships. Exemptions for con-

sent do not turn this statute from a prohibition into a regulation. Consent simply takes the encounter outside the realm of the statute altogether, not unlike in other contexts of law where consent removes an action from the domain of a particular law. For example, consent removes a search from the realm of the Fourth Amendment, *see, U.S. v. Figueroa-Espana*, 511 F.3d 696, 702 (7th Cir. 2007); removes the prohibition on intercepting telephone calls, Indiana Code § 35–31.5–2–176; and removes the criminal intent from any number of prohibitions in criminal statutes from robbery to sexual assault.

Nevertheless, even if we were to decide that the exceptions to the prohibition make the Indiana statute a regulation and not a prohibition, then what we have is a statute that imposes more restrictive interstate regulations—a category not addressed at all by the savings clause. The district court used this fact to assume that the law was pre-empted and thus enjoined. The court reasoned, "[b]y defining in this way a universe of state laws that are *not* preempted, this provision, by implication, suggests that Congress intended for state laws outside of that defined universe to be preempted." *Patriotic Veterans*, 821 F. Supp. 2d at 1077 (emphasis in original). The court's presumption of preemption from a lack of express language cannot be reconciled with the Supreme Court's ardent instruction that "we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Wyeth*, 555 U.S. at 565 (internal citations omitted). When the text of a preemption clause is susceptible of more than one plausible reading, courts ordinarily "accept the reading that disfavors preemption." *Altria Group*, 555 U.S. at 77. Thus the district court erred by presuming that laws that were not explicitly saved

were preempted. In fact, the TCPA says nothing about preempting laws that regulate the interstate use of automatic dialing systems. Therefore, we must conclude that they are not preempted.

The plain language of the text reinforced by the presumption against preemption prevents this court from looking any further—odd result or not. But even if we were permitted to consider whether the statute as written reflected the true intent of Congress, we might well conclude that the result was not an odd result after all. The TCPA and its regulations set forth some specific regulations regarding autodialer calls, including constraints on the timing and recipients of telephone calls. 47 C.F.R. § 64.1200 (for example, telephone solicitation may only be made to a residential telephone customer between 8 a.m. and 9 p.m. local time). Given the myriad variations possible in state regulations of autodialers which might or might not coincide with those promulgated by the federal government, Congress may have determined that states could pass regulations with flat-out prohibitions but not regulations with more restrictive interstate constraints. An absolute prohibition makes the rules on the use of autodialers easy to follow on a state-by-state basis (and, one might argue, so do black and white rules requiring consent), but asking autodialing companies to comply with a web of fifty different state regulatory systems with different requirements about the permissible hours and types of call recipients might create havoc. But it is worth emphasizing once again that it is not the court's role to determine whether Congress's rationale was sound. The plain language dictates that the Indiana statute is not expressly preempted. This is true whether the Indiana statute is one that merely regulates autodialed interstate calls or prohibits them.

The fact that we hold that there is no express preemption does not end the matter. When there is no express preemption, there are two forms of implied preemption that a court might consider:

> (1) field preemption, which arises when the federal regulatory scheme is so pervasive or the federal interest so dominant that it may be inferred that Congress intended to occupy the entire legislative field; and (2) conflict preemption, which arises when state law conflicts with federal law to the extent that "compliance with both federal and state regulations is a physical impossibility," or the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 984 (7th Cir. 2012) (*citing Arizona v. U.S.*, 132 S. Ct. at 2501); *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–373 (2000). As we will explain further below, the categories of preemption are not "rigidly distinct."

Just as with express preemption, neither of these implied preemption doctrines can be lightly applied. "Implied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that preempts state law.'" *Chamber of Commerce v. Whiting*, 131 S. Ct. 1968, 1985 (2011) (citing *Gade v. Nat'l Solid Wastes Mgmt Assn.*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). Because we begin with the assumption that a state's historic police powers cannot be preempted by a federal act unless the preemption was the clear intent of

Congress, the burden is on Patriotic Veterans to present a showing of implied preemption that is strong enough to overcome the presumption that state and local regulations can coexist with federal regulation. *Hillsborough County, Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 715–716 (1985).

Patriotic Veterans argues that the regulations of the FCC specifically permit noncommercial pre-recorded messages and thus Indiana's law conflicts with the full purposes and objectives of Congress. Patriotic Veterans, however, misunderstands the nature of conflict preemption. In addition to starting with a presumption against preemption, in order for a court to find conflict preemption it must either be impossible for a private party to comply with both the state and federal law (*English v. Gen. Elec. Co.*, 496 U.S. 72, 79(1990)), or the state law must stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013). The fact that a state has more stringent regulations than a federal law does not constitute conflict preemption. Otherwise every time a state chose to apply a more rigorous standard when regulating conduct within the state, the result would be impermissible. We know, however, that states frequently, and without preemption by federal law, create more stringent laws regarding minimum wage, employment discrimination, educational standards, gambling, and highway safety, to name a few.

A comparison of two Supreme Court cases evaluating conflict preemption reveals the importance of true impossibility for conflict preemption. In *Mutual Pharm. Co., Inc. v. Bartlett*, the Supreme Court found conflict preemption where a pharmaceutical manufacturing company could not comply

with both its state-law duty to strengthen the warnings on a particular drug's label and its federal-law duty not to alter the label. *Id.,* 133 S. Ct. 2466, 2473 (2013). In contrast, the Court found no conflict preemption where a state adopted a regulation requiring propeller guards on all motorboats where the Coast Guard opted not to so regulate. *Sprietsma v. Mercury Marine,* 537 U.S. 51, 64–66 (2002).

Patriotic Veterans has not demonstrated that it would be impossible to comply with both the state statute and the TCPA. The veterans group could comply with the Indiana requirements for consent without violating any aspects of the TCPA. Conflict preemption requires complete impossibility—not mere inconvenience or hardship.

Patriotic Veterans also argues that Indiana's law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—a form of conflict preemption sometimes called "purposes and objectives preemption." *Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 873 (2000). It does so, says the veterans group, by "frustrat[ing] Congressional desire to protect noncommercial speech." Appellees Brief at 28–29. But the presumption against preemption of state laws dictates that a law must do "major damage" to clear and substantial federal interests before the Supremacy Clause will demand that state law surrenders to federal regulation. *Hillman,* 133 S. Ct. at 1950. We fail to see how Indiana's law stands as an obstacle to the accomplishments of Congress's goal to protect the privacy of citizens against unsolicited telephone calls. *See* 47 U.S.C. § 227(b)(2)(B)(ii)(I); (c)(1); & (c)(2) (noting the privacy interests behind the statute and requiring the Commission to consider privacy interests in using its rulemaking authority).

*See also* S. REP. 102–178, at 1, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1968 (The purpose of the TCPA is to "protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home and to facilitate interstate commerce by restricting certain uses of facsimile (fax) machines and automatic dialers."). By restricting unsolicited automated telephone calls to the home, Indiana's statute not only does not conflict with the federal purpose but fully supports it.

Patriotic Veterans notes that throughout the legislative history of the TCPA Congress indicated its intent to protect First Amendment freedoms. Of course it goes without saying that any time Congress passes a law, one of its objectives always must be to comply with the Constitution. Such an objective, however, does not turn the legislation into one that has the purpose of protecting constitutional concerns. The objective noted in the legislative history states that the purpose of the TCPA is "to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home." *Id.* The fact that the legislature attempted to do so without violating the free speech rights protected by the First Amendment does not turn the legislation into one with the purpose and objective of protecting non-commercial robocalls. The Indiana statute does not create conflict preemption with the TCPA, either by making it impossible to comply with the federal statute or by doing major damage to the purposes and objectives of the federal statute.

The Indiana statute could be preempted still if we find field preemption—that is, if the TCPA protects a federal regulatory scheme that is so pervasive or a federal interest

that is so dominant that it may be inferred that Congress intended to occupy the entire legislative field. *Arizona*, 132 S. Ct. at 2501. When Congress occupies an entire field, one might also say that Congress has set forth a purpose and objective of controlling an entire field of regulation. In this way the purposes and objectives subcategory of conflict preemption merges with field preemption. *English*, 496 U.S. at 79 n.5 ("A state law that falls within a pre-empted field conflicts with Congress's intent (either express or plainly implied) to exclude state regulation.")

In any event, no matter whether we deem it field preemption or the purposes and objectives subcategory of conflict preemption, the area of telemarketing protection is unlike those in which the courts have found that a scatter-shot method of regulation and enforcement would frustrate federal purposes either in law enforcement, foreign relations, public safety or the like. *See e.g. Arizona*, 132 S. Ct. at 2502 (federal framework of laws on alien registration constitutes field preemption). *Pacific Gas & Elec. v. State Energy Res. Conservation & Dev. Comm'n*, 461, U.S. 190, 212–213 (1983) (nuclear regulation); *Napier v. Atl. Coast Line R. Co.*, 272 U.S. 605, 612–13 (1926) (regulating locomotive equipment used on a highway of interstate commerce).

The comprehensive nature of federal law on a subject does not necessarily mean that states are barred from imposing additional requirements. *Hillsborough County*, 471 U.S. at 717. The non-preemption clause of the TCPA is the first and best evidence that the federal government did not intend to occupy the entire field of robocall regulation. 47 U.S.C. § 227(f)(1)(stating first and foremost, "State law not preempted"); *see also Van Bergen v. Minnesota*, 59 F.3d 1541,

1548 (8th Cir. 1995) (coming to the same conclusion in evaluating whether the TCPA preempts a similar state law). The TCPA also expressly contemplates that states will continue to regulate telemarketing. 47 U.S.C. § 227(c)(3)(J) (any federal "do-not-call" list must be designed to enable states to use the database to enforce state law); 47 U.S.C. § 227(f)(2) (If states create a do-not-call list, it must include any federal "do not call" list adopted pursuant to the TCPA). And as we have noted, states have long regulated the content of abusive telephone calls, and interferences with the peaceful enjoyment of the home. *See supra* at 6–7.

Patriotic Veterans cites our decision in *Indiana Bell Tel. Co., Inc. v. Indiana Util. Regulatory Com'n.*, 359 F.3d 493, 497 (7th Cir. 2004) and the Supreme Court in *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992), for the proposition that "[i]n determining whether state law stands as an obstacle to the full implementation of federal law, it is not enough to say that the ultimate goal of both federal and state law is the same. A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach the goal." *Indiana Bell*, 359 F.3d at 497, *citing Gade*, 505 U.S. at 103. In *Indiana Bell*, a state agency's order interfered with the method that the federal act sets forth for the application process for long-distance telephone service providers to enter the long distance market. *Id*. at 497–98. In brief, the language in *Indiana Bell* indicates that conflict preemption applies not only to conflicts between federal and state substantive rules, but also to state rules that interfere with processes established by federal acts. In this case, however, there is no such conflict in process. The Indiana law is more restrictive than the federal law, but in no way does it frustrate any process that the federal statute requires.

For similar reasons the *Gade* comparison is also inapt. In *Gade*, the Supreme Court considered a state health and safety statute that overlapped with the federal Occupational Safety and Health Act (OSHA). *Gade*, 505 U.S. at 91. The Court found that OSHA, as a whole, evinced a Congressional intent to avoid subjecting workers and employers to duplicative regulation, and therefore a state could only develop an occupational safety and health program tailored to its own needs if it was willing to displace completely the applicable federal regulations. *Id.* at 103–04.

But unlike OSHA which evinces a clear Congressional intent to create one set of rules and regulations, the federal rules on telemarketing indicate that Congress could not have intended to have a uniform telemarketing policy. The very fact that Congress allows states to regulate their own intrastate telemarketing demonstrates this.[4] Furthermore, the TCPA contains an express non-preemption statute expressing an intent not to occupy the entire field. 47 U.S.C. §227(f)(1) *See also Van Bergen*, 59 F.3d at 1548; *FreeEats.com*, 712 N.W.2d at 838–39. For these reasons, the Eighth Circuit has also concluded that there was no intent by Congress to create field preemption under the TCPA:

> The TCPA carries no implication that Congress intended to preempt state law; the statute includes a

---

[4] Certainly Congress could have found an interstate hook to regulate intrastate telemarketing, as such marketing uses the telephone wires, even for intrastate calls and thus constitutes interstate commerce. *See U.S. v. Richeson*, 338 F.3d 653, 660–61 (7th Cir. 2003)) (noting that federal courts have jurisdiction over intrastate calls as jurisdiction is supplied by the nature of the instrumentality or facility used, not by separate proof of interstate movement.).

preemption provision expressly not preempting cer-
tain state laws. If Congress intended to preempt other
state laws, that intent could easily have been ex-
pressed as part of the same provision. Further, the
preemption provision makes it clear that Congress
did not intend to "occupy the field" of ADAD regula-
tion, or to promote national uniformity of ADAD
regulation, as it expressly does not preempt state reg-
ulation of intrastate ADAD calls that differs from fed-
eral regulation.

*Van Bergen*, 59 F.3d at 1548.

In any event, the district court never relied on either of
these implied preemption doctrines to justify its holding. In-
stead the district court attempted to discern the intent be-
hind Congress's plain language and then assumed that any
types of regulations not explicitly saved from preemption by
the savings clause must be preempted. The court combined
its presumption from the language of the savings clause
with legislative history to determine that "the TCPA was en-
acted with the purpose of establishing exclusive regulations
relating to the interstate use of automatic telephone dialing
systems." *Patriotic Veterans*, 821 F. Supp. 2d at 1078. We have
now established that neither the exploration into Congres-
sional intent via legislative history nor the presumption of
preemption was a legitimate pathway for evaluating wheth-
er the TCPA preempts the Indiana statute.

"Resort to legislative history is only justified where the
face of the [statute] is inescapably ambiguous." *Holder v.
Hall*, 512 U.S. 874, 932 n.28 (1994) (O'Connor, J., *concurring in
part, concurring in the judgment*). The "inescapably" language
means that a court must begin with the presumption that

Congress meant exactly what it said. *U.S. v. LaBonte*, 520 U.S. 751, 757 (1997). A court's inquiry "begins with the statutory text, and ends there as well if the text is unambiguous," *Bedrock Ltd. v. U.S.*, 541 U.S. 176, 183 (2004). The statute is not inescapably ambiguous here. But even if it were, resort to the legislative history would not help clarify Patriotic Veterans' argument.

The Senate Report discussing the purpose for the legislation included the following statement:

> [O]ver 40 States have enacted legislation limiting the use of ADRMPs [automatic dialer recorded message players] or otherwise restricting unsolicited telemarketing. These measures have had limited effect, however, because States do not have jurisdiction over interstate calls. Many States have expressed a desire for Federal legislation to regulate interstate telemarketing calls to supplement their restrictions on intrastate calls.

S. Rep. No. 102–178, at 3, *reprinted in* 1991 U.S.C.C.A.N. 1968, 1970. This language actually reinforces the notion that Congress's purpose in enacting the TCPA was to do what it could to help states limit unsolicited automatically dialed telephone recordings. The language does indeed assume that states do not have jurisdiction over interstate calls, but that assumption does not reflect a legislative *purpose* to deny jurisdiction over interstate calls to the states. Rather it reflects but one rationale for enacting the law. Whether that rationale was correct or not is outside the purview of a court's review.

The same can be said of the comments of Senator Hollings, co-sponsor of the TCPA who noted, "[p]ursuant to the general preemptive effect of the Communications Act of 1934, State regulation of interstate communications, including interstate communications initiated for telemarketing purposes is preempted." 137 Cong. Rec. S18781, S18784 (daily ed. Nov. 27, 1991).

First and foremost, the comments of individual senators do not necessarily reflect Congress's intent in enacting any particular piece of legislation. *See Mims v. Arrow Fin. Serv., LLC.*, 132 S. Ct. 740, 752 (2012) (noting that Senator Hollings' comments in support of the TCPA are not controlling on any court's decision). *See also Wisconsin Educ. Ass'n Council v. Walker*, 705 F.3d 640, 652 (7th Cir. 2013). That is why the Supreme Court has said that when reviewing a statute, a court must "begin by examining the text, not by psychoanalyzing those who enacted it." *Carter v. U.S.*, 530 U.S. 255, 271 (2000) (internal citations omitted).

Moreover, Senator Hollings' comments indicate that he did not think that any part of the TCPA itself preempted any state's laws. Rather, he seemed to be under the mistaken assumption that the broader Federal Communications Act of 1934 (which was amended by the TCPA) somehow preempted all state laws regulating interstate telephone calls. That broader Act, however, only regulates communication services and facilities, not callers or the content of telephone communications. 47 U.S.C. § 151.

Furthermore, if it was appropriate to turn to legislative history to construe the intent of a statute, one would also have had to consider the fact that earlier, un-enacted drafts of the TCPA would have expressly preempted "any provi-

sion of State law concerning interstate communications that are inconsistent with the interstate communications provisions of this section." 137 Cong. Rec. S 16200, 16202 (1991). We cannot assume that Congress intended to enact statutory language that it has earlier discarded in favor of other language. *Chickasaw Nation v. U.S.*, 534 U.S. 84, 93 (2001).

In any event, this frolic and detour into the legislative history and the intent of legislation's sponsor is unnecessary. It is clear that the TCPA does not expressly or impliedly preempt the Indiana statute and we so hold. Other courts have reached the same conclusion when considering federal preemption by the TCPA of similar state statutes. *See Van Bergen*, 59 F.3d at 1548; *Sussman v. I.C. Sys., Inc.*, 928 F. Supp. 2d 784, 792 (S.D.N.Y. 2013), *FreeEats.com*, 712 N.W.2d at 841; *Utah Div. of Consumer Prot. v. Flagship Capital*, 125 P.3d 894, 901 (Utah 2005).

Because the district court decided the case on the basis of preemption, it never had reason to address the arguments regarding the constitutionality of the statute. We are a reviewing court and think that the argument would benefit from two-tiered examination. We thus reverse the ruling on preemption and remand for an evaluation of whether Indiana's statute violates the free speech rights protected by the First Amendment to the United States Constitution.