David GREENLEY, Plaintiff,

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA,** Defendant,

and

**United States of America, Intervenor.**

**Case No. 16–cv–3773 (WMW/KMM)**

United States District Court, D. Minnesota.

Signed September 19, 2017

1132

Abbas Kazerounian, Kazerounian Law Group, APC, Jason Alan Ibey, Kazerouni Law Group, APC, Costa Mesa, CA, Patrick J. Helwig, Peter F. Barry, Barry & Helwig, LLC, Minneapolis, MN, for Plaintiff.

Brendan D. Cummins, Cummins & Cummins, PLLP, Minneapolis, MN, Terrance G. Reed, Lankford & Reed PLLC, Alexandria, VA, for Defendant. Anjali Motgi, Washington, DC, Ann M. Bildtsen, United States Attorney's Office, Minneapolis, MN, for Intervenor.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

Wilhelmina M. Wright, United States District Judge

Plaintiff David Greenley commenced this class action[1] lawsuit against Defendant Laborers' International Union of North America (LIUNA) seeking statutory damages and injunctive relief for alleged violations of the Telephone Consumer Protection Act (TCPA), 47 U.S.C. §§ 227, *et seq.* Greenley's two-count amended complaint asserts negligent and knowing or willful violations of the TCPA. Before the Court is LIUNA's motion to dismiss the amended complaint. (Dkt. 22.) The United States of America has intervened to support the constitutionality of the TCPA, to the extent that LIUNA seeks to dismiss the amended complaint on constitutional grounds. For the reasons addressed below, the Court denies LIUNA's motion to dismiss.

### BACKGROUND

Greenley's amended complaint alleges that during a sixteen-month period from November 14, 2014, through March 16, 2016, LIUNA both negligently (Count I) and knowingly and/or willfully (Count II) made one unsolicited telephone call and sent four unsolicited text messages to his cellular telephone using an automatic telephone dialing system (ATDS), in violation of the TCPA.

The unsolicited telephone call involved an automated prerecorded message, the content of which is not described in the amended complaint. The first two unsolicited text messages stated:

Msg 1 of 2: This confirms yr consent to receive msgs from LIUNA & affiliates including any autodialed call & txt msg about important matters Reply STOP to quit.

Msg 2 of 2: Important matters include yr contract, benefits, union operations, political & legislative matters. Reply STOP to quit. Msg & data rates may apply.

The third unsolicited text message stated: "Msg from your union: Join us next week for Laborers Day @the Capitol. Reception Tues & meet w/legislators on Wed. Register at http://bit.ly/1psye0y." Greenly replied "STOP" to this message, which prompted a fourth text message that stated: "LIUNA: You have been removed from mobile alerts. Info: txt@mcom.ms Removed by mistake? Reply OOPS to rejoin."

According to the amended complaint, Greenley has never been a member or prospective member of LIUNA, and he has never had or expressed any interest in being a member of LIUNA or receiving the unsolicited communications described above. The amended complaint alleges that LIUNA's violations of the TCPA harmed Greenley by causing him to incur cellular telephone charges; invading his privacy; frustrating, distressing, harassing, and annoying him; and forcing him "and other similarly situated class members to live without the utility of their cellular phones because they were occupied by calls or text messages, causing annoyance and lost time."

LIUNA moves to dismiss the amended complaint on alternative grounds. LIUNA argues that Greenley lacks statutory and constitutional standing, the amended complaint fails to state a claim on which relief can be granted, the relief Greenley seeks is barred in whole or in part by the *Noerr–Pennington* doctrine and the Norris–LaGuardia Act, and the TCPA violates the First Amendment to the United States Constitution. On May 10, 2017, the United States filed a notice of intervention and

---

1. Class certification has not yet been addressed in this case.

memorandum of law in support of the constitutionality of the TCPA, taking no position on LIUNA's non-constitutional arguments. Greenley subsequently joined in the arguments advanced in the United States' memorandum. LIUNA filed a memorandum in opposition to the United States.

## ANALYSIS

■ LIUNA moves to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) on several grounds. Under Rule 12(b)(1), a defendant may challenge the plaintiff's complaint for lack of subject-matter jurisdiction either on its face or on the factual truthfulness of its averments. *See, e.g., Titus v. Sullivan*, 4 F.3d 590, 593 (8th Cir. 1993); *see also Sandusky Wellness Ctr., LLC v. MedTox Sci., Inc.*, 250 F.Supp.3d 354, 2017 WL 1483330, at *2 (D. Minn. Apr. 25, 2017) (stating that a motion to dismiss for lack of standing may be treated as either a "facial attack" or a "factual attack" on jurisdiction). In a facial attack, the non-moving party "receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir. 1990). But when evaluating a factual challenge to subject-matter jurisdiction, the district court may weigh evidence outside the pleadings. *Id.* at 729–30. Here, LIUNA raises both facial and factual challenges to jurisdiction. Accordingly, to the extent that LIUNA raises a factual challenge to jurisdiction, the Court considers evidence outside the pleadings. But the Court analyzes LIUNA's Rule 12(b)(1) facial challenge under the same legal standard as is applied to LIUNA's Rule 12(b)(6) arguments.

A complaint must be dismissed if it fails to state a claim on which relief can be granted. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion, the complaint must allege sufficient facts that, accepted as true, state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). When determining whether the complaint states such a claim, a district court accepts as true all factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor. *Blankenship v. USA Truck, Inc.*, 601 F.3d 852, 853 (8th Cir. 2010). The factual allegations need not be detailed, but they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). A plaintiff, however, must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555, 127 S.Ct. 1955. Legal conclusions that are couched as factual allegations may be disregarded by the district court. *See Iqbal*, 556 U.S. at 678–79, 129 S.Ct. 1937.

## I. Standing

■ LIUNA moves to dismiss the amended complaint because Greenley lacks both constitutional and statutory standing. "When a plaintiff alleges injury to rights conferred by statute, two separate standing-related inquiries are implicated: whether the plaintiff has Article III standing (constitutional standing) and whether the statute gives that plaintiff authority to sue (statutory standing)." *Miller v. Redwood Toxicology Lab., Inc.*, 688 F.3d 928, 934 (8th Cir. 2012). The Court addresses each inquiry in turn.

### A. Constitutional Standing

■ Article III of the United States Constitution limits federal jurisdiction to actual cases or controversies. U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Hargis v. Access Capital Funding, LLC*, 674 F.3d 783, 790

(8th Cir. 2012). As a jurisdictional prerequisite, standing must be established before reaching the merits of a lawsuit. *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). If a federal district court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action. Fed. R. Civ. P. 12(h)(3). When standing is challenged, the party invoking federal jurisdiction must establish that the requirements of standing have been satisfied. *Mineta*, 495 F.3d at 569. Standing is determined based on the facts as they existed when the complaint was filed. *Lujan*, 504 U.S. at 569 n.4, 112 S.Ct. 2130.

 To satisfy the requirements of standing, a plaintiff must (1) have suffered an injury in fact, (2) establish a causal relationship between the defendant's conduct and the alleged injury, and (3) show that the injury would be redressed by a favorable decision. *Id.* at 560–61, 112 S.Ct. 2130; *Mineta*, 495 F.3d at 569. Only the injury-in-fact element of standing is disputed here.[2] An alleged "injury in fact" must be "concrete, particularized, and either actual or imminent." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 833–34 (8th Cir. 2009) (citation omitted).

LIUNA asserts that Greenley lacks standing because he has not alleged a "concrete" injury in fact. Relying on the recent decision of the Supreme Court of the United States in *Spokeo, Inc. v. Robins*, —— U.S. ——, 136 S.Ct. 1540, 1548, 194 L.Ed.2d 635 (2016), LIUNA argues that a mere procedural violation of the TCPA is insufficient to establish a concrete injury and that Greenley has not alleged a

concrete injury tied to each communication he received from LIUNA.

In *Spokeo*, the plaintiff alleged a violation of the Fair Credit Reporting Act. 136 S.Ct. at 1544. The Ninth Circuit concluded that the plaintiff adequately satisfied the injury-in-fact requirement by alleging that the defendant "violated *his* statutory rights, not just the statutory rights of other people." *Id.* (quoting *Robins v. Spokeo, Inc.*, 742 F.3d 409, 413 (9th Cir. 2014)). But distinguishing between a particularized injury and a concrete one, the Supreme Court observed that the Ninth Circuit's analysis was deficient because it addressed only whether the plaintiff's injury was *particularized* without separately determining whether the alleged injury was *concrete*. *Spokeo*, 136 S.Ct. at 1550. Notably, the *Spokeo* Court did not hold that the plaintiff lacked standing. Rather, the Supreme Court vacated the Ninth Circuit's decision and remanded the case to that court with instructions to consider whether the plaintiff had alleged an injury that is sufficiently concrete to satisfy the injury-in-fact requirement of Article III standing. *Id.*

The *Spokeo* Court elaborated on the "concreteness" requirement, explaining that a "concrete injury must be *de facto*; that is, it must actually exist" and it must be "real, and not abstract." *Id.* at 1548 (citations omitted) (internal quotation marks omitted). The Court reasoned that "a bare procedural violation, divorced from any concrete harm," does not satisfy the injury-in-fact requirement. *Id.* at 1549. As such, a plaintiff does not "automatically satisf[y] the injury-in-fact requirement

---

2. Although LIUNA challenges causation in connection with its statutory-standing argument, LIUNA does not do so with respect to Article III standing. In any event, the two unchallenged requirements for Article III standing—causation and redressability—are established here. Greenley's alleged injury

traces directly to LIUNA's alleged conduct, as discussed in more detail in the statutory standing analysis that follows, and his injury would be redressed if the Court were to grant him the statutory and injunctive relief he seeks.

whenever a statute grants a person a statutory right." *Id.*

An injury need not be tangible to be concrete; the concreteness requirement can be satisfied by "the *risk* of real harm." *Id.* (emphasis added). "[T]he violation of a procedural right granted by statute can be sufficient in some circumstances to constitute injury in fact," and in those circumstances, a plaintiff "need not allege any *additional* harm beyond the one Congress has identified." *Id.* When determining whether an intangible harm is an injury in fact, the Supreme Court reasoned, "both history and the judgment of Congress play important roles" because "Congress may elevat[e] to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law." *Id.* (alteration in original) (internal quotation marks omitted).

Although it has not analyzed *Spokeo* in the context of alleged TCPA violations, the Eighth Circuit recently interpreted *Spokeo* and applied it to an alleged violation of the Cable Communications Policy Act, 47 U.S.C. § 551. *Braitberg v. Charter Commc'ns, Inc.*, 836 F.3d 925 (8th Cir. 2016). The plaintiff in *Braitberg* alleged that the defendant improperly retained information that had been lawfully obtained, but the plaintiff did not allege that the defendant disclosed or otherwise used that information. *Id.* at 930. "[A] speculative or hypothetical risk is insufficient" to satisfy the concreteness requirement as described in *Spokeo*, the Eighth Circuit concluded. *Id.* Because the plaintiff had identified "no material risk of harm" from the defendant's retention of his personal information, the concreteness requirement of Article III standing was not met. In sum, either a real harm or a material risk of harm stemming from the alleged statutory violation is required. *See id.*

The "vast majority of post-*Spokeo* TCPA cases have concluded that the invasion of privacy, annoyance and wasted time associated with robocalls is sufficient to demonstrate concrete injury." *Sandusky Wellness Ctr.*, 250 F.Supp.3d at 357, 2017 WL 1483330, at *3 (internal quotation marks omitted). "Indeed, most courts find that the receipt of even one unwanted call 'is [generally] enough to clear Article III's low bar for a concrete injury.'" *Id.* (quoting *Ung v. Universal Acceptance Corp.*, 198 F.Supp.3d 1036, 1039 (D. Minn. 2016) (Kyle, J.) (collecting cases)).

Both Congress and the Federal Communications Commission (FCC) "have recognized the harms inherent in the receipt of automated calls, in particular the invasion of privacy and the intrusion upon seclusion." *Ung*, 198 F.Supp.3d at 1038. When it enacted the TCPA, Congress "repeatedly emphasized the nuisance aspect of robocalls, showing that it considered the interruptions that they cause and the time they cause consumers to waste to be one of the harms it sought to remedy." *Mey v. Venture Data, LLC*, 245 F.Supp.3d 771, 2017 WL 1193072, at *7 (N.D. W. Va. Mar. 29, 2017). "They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed." *Id.* (quoting 137 Cong. Rec. 30,-821–30,822 (1991) (testimony of Senator Hollings)). Moreover, "[t]he harm recognized by the ancient common law claim of trespass to chattels—the intentional dispossession of chattel, or the use of or interference with a chattel that is in the possession of another, is a close analog for a TCPA violation." *Mey v. Got Warranty, Inc.*, 193 F.Supp.3d 641, 646 (N.D. W. Va. 2016) (concluding that unwanted telephone calls cause concrete harm). For these reasons, the Court concludes that the TCPA establishes a substantive right to be free from the invasion of privacy and intrusion

upon seclusion caused by automated communications.

The cases that LIUNA cites to the contrary are distinguishable. For example, in *Stoops v. Wells Fargo Bank, N.A.*, the plaintiff "purchased at least thirty-five cell phones ... for the [sole] purpose of filing lawsuits under the [TCPA]." 197 F.Supp.3d 782, 788 (W.D. Pa. 2016). The plaintiff in *Stoops* admitted that she did not use these cell phones for any purpose except to fish for telemarketing calls. *Id.* The district court concluded that the plaintiff had not suffered a concrete injury because she had sought out the telemarketing calls of which she complained. *See id.* at 795–803. Here, by contrast, Greenley attests that he did not purchase the cellular telephone that LIUNA contacted for the sole purpose of initiating TCPA litigation. Thus, *Stoops* also is inapposite.

In *Romero v. Department Stores National Bank*, the harms the plaintiff alleged, such as headaches, sleeping issues, and weight loss, were "divorced from the alleged violation of the TCPA." 199 F.Supp.3d 1256, 1265 (S.D. Cal. 2016). By contrast, Greenley's amended complaint alleges that the unsolicited communications caused him frustration and annoyance and resulted in lost time and the temporary loss of utility of his cellular telephone. The circumstances in *Romero* are inapposite here.

■ In summary, Greenley allegedly received multiple unsolicited automated communications from LIUNA. Greenley has alleged conduct that violated his substantive right, established by the TCPA, to be free from the invasion of privacy and intrusion upon seclusion caused by unsolicited automated communications. This injury is neither hypothetical nor uncertain, and it demonstrates a harm or, at a minimum, a material risk of harm that is not merely a procedural violation.

For these reasons, the Court concludes that Greenley has Article III standing and denies LIUNA's motion to dismiss on this ground.

**B. Statutory Standing**

LIUNA also argues that Greenley lacks statutory standing. According to LIUNA, only a "called party" has statutory standing to raise a TCPA claim, and Greenley has neither alleged that he is a "called party" nor is he in fact a "called party."

■ In contrast to Article III standing, which addresses "the constitutional power of a federal court to resolve a dispute," statutory standing "is simply statutory interpretation: the question it asks is whether Congress ... has accorded *this* injured plaintiff the right to sue the defendant to redress [the plaintiff's] injury." *Miller*, 688 F.3d at 934 (internal quotation marks omitted). Courts begin with the statute's plain language when discerning the scope of a statute. *United States v. Talley*, 16 F.3d 972, 975 (8th Cir. 1994).

■ The TCPA creates a private right of action, stating:

A *person or entity* may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State—

(A) an action based on a violation of this subsection or the regulations prescribed under this subsection to enjoin such violation,

(B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

(C) both such actions.

47 U.S.C. § 227(b)(3) (emphasis added). Thus, the plain language of the TCPA grants statutory standing to any "person or entity." *Id.*; *see also Swope v. Credit Mgmt., LP*, No. 4:12CV832, 2013 WL

**1140**

607830, at *2 (E.D. Mo. Feb. 19, 2013) (reaching same conclusion and rejecting motion to dismiss TCPA claim on statutory-standing grounds). The only relevant statutory reference to a "called party" appears in the affirmative defense provision that pertains to consent. 47 U.S.C. § 227(b)(1)(A) (providing that it is unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the *called party* ) using any automatic telephone dialing system or an artificial or prerecorded voice" (emphasis added)). This reference to "called party" does not limit the class of people who may bring a cause of action under the statute. *See Swope*, 2013 WL 607830, at *2.

LIUNA cites two appellate decisions in support of the proposition that the TCPA limits the right to sue to "called parties." *See Breslow v. Wells Fargo Bank*, 755 F.3d 1265, 1267 (11th Cir. 2014); *Soppet v. Enhanced Recovery Co.*, 679 F.3d 637, 643 (7th Cir. 2012). But those decisions are inapposite. Although both *Breslow* and *Soppet* involved an interpretation of the statutory term "called party" in the TCPA, statutory standing was not at issue in either case. The only decision from a court in the Eighth Circuit addressing statutory standing under the TCPA rejected the argument advanced by LIUNA, as have a number of other courts. *Swope*, 2013 WL 607830, at *2–3; *see also Page v. Regions Bank*, 917 F.Supp.2d 1214, 1219 (N.D. Ala. 2012) (collecting cases).

Even if statutory standing under the TCPA were limited to a "called party," as LIUNA argues, Greenley adequately alleges that he is a "called party." Courts have not uniformly defined the term "called party." Some courts have defined "called party" as the subscriber to the cellular telephone service. *See, e.g., Breslow*, 755 F.3d at 1267; *Soppet*, 679 F.3d at 643. Other courts have recognized that a "called party" may include an "actual recipient" of the communication or a "regular user" of the telephone that received the automated communication. *See, e.g., Leyse v. Bank of Am. Nat'l Ass'n*, 804 F.3d 316, 326 (3d Cir. 2015). The FCC defines "called party" as either the subscriber *or* the non-subscriber customary user of the telephone. *In re Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 FCC Rcd. 7961, 8000–01 (July 10, 2015). This legal question currently awaits a decision from the District of Columbia Circuit in *ACA International v. FCC*, No. 15–1211 (D.C. Cir.).

Here, Greenley has satisfied the narrowest interpretation of "called party"—namely, that the meaning of "called party" is limited to the "subscriber" of the cellular telephone service. The amended complaint alleges that LIUNA sent the unsolicited communications to "Plaintiff's cellular telephone number" and that Greenley answered or read those messages. In the amended complaint, Greenley also refers to the telephone records as "his." Because LIUNA has raised a factual challenge to jurisdiction, the facts on which this Court is permitted to rely are not limited to the pleadings. Greenley has submitted a declaration stating that the cellular telephone number described in the amended complaint has been his personal number, in his name, used by him regularly, and paid for with his personal funds since at least 2006. Although LIUNA submitted public records indicating that the same number is used by a small business, Greenley's declaration explains that he may have listed his personal cellular telephone number as a contact number with the Minnesota Secretary of State when he formed a business entity. On this record, even if statutory standing under the TCPA were limited to a "called party" defined narrowly as the "subscriber" to the cellular telephone service, Greenley satisfies this requirement.

LIUNA also argues that Greenley cannot satisfy statutory standing because, if a business entity—rather than Greenley personally—is the subscriber, then Greenley has not adequately pleaded either that he falls within the zone of interests Congress intended to protect or that LIUNA's alleged conduct proximately caused his injury. But this argument is based on the premise that the telephone number described in the amended complaint did not belong to Greenley and that Greenley did not personally answer or read the communications LIUNA sent. That premise is contrary to the allegations in the amended complaint and the facts asserted in Greenley's declaration, as addressed above.

The Court concludes, for the foregoing reasons, that Greenley has statutory standing under the TCPA and denies LIUNA's motion to dismiss on this ground.

## II. Failure to State a Claim

LIUNA argues that the amended complaint fails to state a claim for three reasons: (1) it fails to allege that Greenley is a "called party" or subscriber, (2) LIUNA is a "labor organization" and therefore is not a "person" subject to liability under the TCPA, and (3) the "confirmation text" sent by LIUNA cannot form the basis of TCPA liability. The Court addresses each argument in turn.

### A. "Called Party"

LIUNA's first argument—that the amended complaint fails to allege that Greenley is a "called party"—is unavailing for the same reasons addressed above with respect to statutory standing. Although this Court may not look outside to pleadings or weigh the evidence on a Rule 12(b)(6) motion as it may with respect to a factual challenge to jurisdiction, Greenley has adequately alleged that he is a "called party" even if the Court looks solely at the facts alleged in the amended complaint. The amended complaint alleges that LIU-NA sent the unsolicited communications to "Plaintiff's cellular telephone number," that Greenley answered or read those messages, and that the telephone records are "his."

Importantly, to withstand a motion to dismiss for failure to state a claim, the factual allegations in a complaint need not be detailed; rather, they must be sufficient to "raise a right to relief above the speculative level" and "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570, 127 S.Ct. 1955. "There is no requirement for direct evidence; the factual allegations may be circumstantial and need only be enough to nudge the claim across the line from conceivable to plausible." *McDonough v. Anoka Cty.*, 799 F.3d 931, 945 (8th Cir. 2015) (internal quotation marks omitted). LIUNA's argument suggests that, to withstand a motion to dismiss, Greenley was required to explicitly state that he "subscribed" to the cellular telephone service or to attach evidence that he is the subscriber. That level of specificity and supporting evidence is not required at the pleading stage.

Accordingly, the Court denies LIUNA's motion to dismiss on this ground.

### B. "Person"

██ LIUNA also argues that, because it is a labor organization, it is not a "person" subject to liability under the TCPA. The TCPA prohibitions apply to "any person," and thus subject "any person" to liability. *See* 47 U.S.C. § 227(b)(1). The TCPA provides that "[t]he term 'person' includes an individual, partnership, association, joint-stock company, trust, or corporation." 47 U.S.C. § 153(39). LIUNA argues that, because it is none of these things, it cannot be sued under the TCPA.

██ Notably, the TCPA's definition of "person" prefaces its list with the word "includes." *Id.* This term "suggests Con-

gress was being illustrative rather than exclusive with the list following the phrase." *In re Union Pac. R.R. Emp't Practices Litig.*, 479 F.3d 936, 946 (8th Cir. 2007); *accord Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100, 62 S.Ct. 1, 86 L.Ed. 65 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."). When used in a statutory definition, "the word 'includes' ... 'is usually a term of enlargement, and not of limitation.'" *Pattison Sand Co., LLC v. Fed. Mine Safety & Health Review Comm'n*, 688 F.3d 507, 513 (8th Cir. 2012) (quoting *Burgess v. United States*, 553 U.S. 124, 131 n.3, 128 S.Ct. 1572, 170 L.Ed.2d 478 (2008)). The fact that "labor organization" is not expressly listed in the TCPA's definition of "person" does not necessarily exclude LIUNA from that definition.

Greenley asserts that a "labor organization" is akin to an "association," which is expressly included in the TCPA's definition of "person." The Court agrees. An "association" means, among other definitions, "[a] gathering of people for a common purpose." Black's Law Dictionary (10th ed. 2014); *accord Sweezy v. State of N.H. by Wyman*, 354 U.S. 234, 247, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957) ("An association is said to be any group of persons, whether temporarily or permanently associated together, for joint action or advancement or views on any subject."). Although LIUNA cites a number of statutes that define or treat "labor organizations" and "associations" as distinct, these other statutes are extrinsic to the TCPA and, therefore, have limited persuasive value here.[3]

Based on the preceding analysis, the Court concludes that LIUNA is a "person" subject to liability under the TCPA and denies LIUNA's motion to dismiss on this ground.

**C. Confirmatory Texts**

 LIUNA also argues that the fourth text message described in the amended complaint is not actionable because it merely confirmed Greenley's request to stop receiving text messages. This argument lacks merit. The "safe harbor" for confirmatory texts on which LIUNA relies is applicable only when a confirmatory message is sent "to consumers from whom [the sender] ha[s] obtained prior express consent" to subsequently "confirm receipt of a consumer's opt-out request." *Soundbite Communications*, 27 FCC Rcd. 15391 (F.C.C.), 27 F.C.C.R. 15391, 57 Communications Reg. (P&F) 107 (2012). Here, because the amended complaint alleges that Greenley *never* consented to receiving communications from LIUNA, this safe harbor does not apply.

Thus, the Court denies LIUNA's motion to dismiss on this ground.

**III. The Norris–LaGuardia Act**

LIUNA argues that the Norris–LaGuardia Act, 29 U.S.C. § 102, prohibits federal courts from exercising equitable jurisdiction over labor disputes and, therefore, bars Greenley from seeking injunctive relief in this case.

Congress enacted the Norris–LaGuardia Act in 1932 to "curtail[ ] the authority of a district court to issue injunctions in a labor dispute." *Brady v. Nat'l Football League*, 644 F.3d 661, 669 (8th Cir. 2011). The Act

---

**3.** Moreover, in one labor statute to which LIUNA cites, another subsection of the statute defines "labor organization" to include "any organization of any kind, any agency, or employee representation committee, group,

*association*, or plan." 29 U.S.C. § 402(i) (emphasis added). This definition belies LIUNA's argument that labor organizations cannot be considered "associations."

provides that "[n]o court of the United States ... shall have jurisdiction to issue any ... temporary or permanent injunction in a case involving or growing out of a labor dispute, except in strict conformity with the provisions of this chapter." 29 U.S.C. § 101. The Act defines "labor dispute" broadly to include "any controversy concerning terms or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether or not the disputants stand in the proximate relation of employer and employee." 29 U.S.C. § 113(c).

■ "The critical element in determining whether the provisions of the Norris–LaGuardia Act apply is whether the employer-employee relationship is the matrix of the controversy." *Jacksonville Bulk Terminals, Inc. v. Int'l Longshoremen's Ass'n*, 457 U.S. 702, 712, 102 S.Ct. 2672, 73 L.Ed.2d 327 (1982). Here, Greenley is *not* a member or employee of LIUNA and is *not* involved in a labor dispute with LIUNA. Moreover, the dispute between Greenley and LIUNA is unrelated to and does not arise from a labor dispute or any employer-employee relationship. To be sure, the Norris–LaGuardia Act defines "labor dispute" broadly. But the fact that some of the messages LIUNA sent to Greenley are tangentially related to LIUNA's union activities does not transform this TCPA lawsuit into one that involves or arises from a labor dispute. LIUNA's argument, taken to its logical conclusion, would extend the applicability of the Norris–LaGuardia Act to any dispute of any kind that involves a labor union. That is neither a correct nor a reasonable interpretation of the law.

Because the Norris–LaGuardia Act does not bar Greenley from seeking injunctive relief, the Court denies LIUNA's motion to dismiss on this ground.

## IV. The *Noerr–Pennington* Doctrine

■ LIUNA also argues that the *Noerr–Pennington* doctrine bars Greenley's lawsuit. Whether the *Noerr–Pennington* doctrine applies in the TCPA context appears to be an issue of first impression.

■ The *Noerr–Pennington* doctrine "is a defense to liability premised on the defendant's actions of exercising [the defendant's] own private rights to free speech and to petition the government." *Hinshaw v. Smith*, 436 F.3d 997, 1003 (8th Cir. 2006). The *Noerr–Pennignton* doctrine originated from the Supreme Court's decision in *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), a case that involved antitrust claims. The Supreme Court later explained that the *Noerr–Pennington* doctrine is grounded in the First Amendment's guarantee of the right to petition the government. *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 611–12, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); *Hufsmith v. Weaver*, 817 F.2d 455, 458 (8th Cir. 1987). Because "[t]he right to petition means more than simply the right to communicate directly with the government," protection under the *Noerr–Pennington* doctrine "necessarily includes those activities reasonably and normally attendant to effective petitioning." *In re IBP Confidential Bus. Documents Litig.*, 755 F.2d 1300, 1310 (8th Cir. 1985). As such, courts have "extended the doctrine beyond the antitrust context to a limited extent" to "immunize defendants seeking to influence government action from liability" in other contexts, such as tortious interference with business or conspiracy. *Id.* at 1312–13.

■ But "[t]his limited extension of the *Noerr–Pennington* doctrine does not

support the conclusion that one who seeks to influence governmental action escapes liability for any and all injuries inflicted in the course of genuine petitioning activity." *Id.* at 1313. Certain activities "do not qualify for protection even if undertaken in a genuine attempt to influence governmental policy." *Id.* For example, the *Noerr–Pennington* doctrine does not protect violence, illegal acts or defamation; nor does it "immunize a defendant from liability for injuries resulting from governmental action secured by illegal means." *Id.* When acknowledging these limitations to the *Noerr–Pennington* doctrine, the Eighth Circuit concluded that "extending absolute immunity to all communications made in the course of petitioning the government, whether or not such communications were made in the confines of an actual proceeding, is unwarranted by the *Noerr–Pennington* doctrine and also unwise." *Id.*

Here, LIUNA asserts that because the messages it sent to Greenley pertained to lobbying activity, LIUNA's conduct falls within the *Noerr–Pennington* doctrine as reasonably attendant to petitioning activity. In advancing this argument, LIUNA relies on *Sosa v. DirectTV, Inc.*, 437 F.3d 923, 935 (9th Cir. 2006), which held that *Noerr–Pennington* immunity extends to prelitigation demand letters. In support of its holding in *Sosa*, the Ninth Circuit observed that when "determining whether the burdened conduct falls under the protection of the Petition Clause, we must give adequate 'breathing space' to the right of petition." 437 F.3d at 931–32. Even so, the Ninth Circuit recognized that prelitigation demand letters sent between private parties are not petitions to the government. *Id.* at 933. The *Sosa* court nonetheless held that the *Noerr–Pennington* doctrine may preclude burdening the use

of such letters—which are precursors to petitioning the courts—"so as to preserve the breathing space required for the effective exercise of the rights it protects." *Id.* Relying on this reasoning, LIUNA argues that the communications it sent to Greenely—although they were not petitions to the government—were reasonably attendant to petitioning activity and, therefore, necessary to the effective exercise of LIUNA's petitioning rights.

The circumstances in *Sosa* are inapposite for at least two reasons. First, the conduct in *Sosa*—sending prelitigation demand letters—was not, in itself, unlawful. In contrast, by enacting the TCPA, Congress has prohibited the manner in which LIUNA allegedly sent unsolicited automatic communications to Greenley.[4] Importantly, the *Noerr–Pennington* doctrine does not extend to illegal conduct "even if undertaken in a genuine attempt to influence governmental policy." *In re IBP*, 755 F.2d at 1313.

Second, the *Noerr–Pennington* doctrine immunizes a defendant from "liability [that is] premised on the defendant's actions of exercising [the defendant's] own private rights to free speech and to petition the government." *Hinshaw*, 436 F.3d at 1003; *accord Int'l Motor Contest Ass'n v. Staley*, 434 F.Supp.2d 650, 663 (N.D. Iowa 2006) (explaining that the *Noerr–Pennington* doctrine does not apply when the petitioning activity "is not identified as the inequitable or wrongful conduct"). In *Sosa*, the issue was whether the act of sending a prelitigation demand could be burdened by subjecting the sender to liability. *Sosa's* rationale would apply to a prelitigation demand sent by any means of communication, but would not apply to a communication that did not involve a prelitigation

4. LIUNA challenges whether Congress has the authority to make such conduct illegal without running afoul of the First Amend-

ment. That issue is addressed below in Part V of this Order.

demand, because the *content* of the message was the basis for liability rather than the means of communication. *See* 437 F.3d at 936 (analyzing the substantive purpose of prelitigation demands and referring generally to "prelitigation *communications*" (emphasis added)). Here, by contrast, LIUNA's potential liability is not premised on the fact that LIUNA's messages pertained to petitioning activity. Rather, LIUNA's potential liability is based on the *means* LIUNA used to communicate its messages. LIUNA is not prohibited from contacting individuals—Greenley included—by other means, including but not limited to flyers, mailings, emails, non-automated calls, or automated calls to consenting recipients. Rather, the TCPA prohibits one particular means of sending LIUNA's messages. A prohibition on one particular means of sending a message does not burden or diminish the "breathing space" required for effective petitioning activity.

Accordingly, the Court concludes that the *Noerr–Pennington* doctrine does not immunize LIUNA from liability and, therefore, denies LIUNA's motion to dismiss on this ground.

## V. The First Amendment

LIUNA argues that the TCPA violates the First Amendment to the United States Constitution both on its face and as applied to the messages LIUNA sent to Greenley.[5]

---

5. LIUNA also asserts that the TCPA is an unconstitutional prior restraint on speech. This argument "misunderstands the meaning of 'prior restraint' and ignores the long-held distinction between prior restraints and subsequent punishments." *Nat'l Fed'n of Blind v. FTC*, 303 F.Supp.2d 707, 723 (D. Md. 2004), *aff'd* 420 F.3d 331 (4th Cir. 2005). Although "it is presumptively unlawful to bar speech before it occurs, First Amendment law fully accepts the ability to penalize speech that occurred in the *past*, after it has been challenged and the speaker has had the opportu-

## A. LIUNA's Facial Challenge

LIUNA first contends that the TCPA is facially unconstitutional. To prevail on a typical facial challenge, LIUNA must establish that "no set of circumstances exists under which [the TCPA] would be valid, or that the statute lacks any plainly legitimate sweep." *Minn. Majority v. Mansky*, 708 F.3d 1051, 1056 (8th Cir. 2013) (internal quotation marks omitted). In the First Amendment context, a law also may be invalidated on a facial challenge as overbroad if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id.* (quoting *United States v. Stevens*, 559 U.S. 460, 473, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010)).

The First Amendment prohibits Congress from enacting laws "abridging the freedom of speech." U.S. Const. amend. I. Congress "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 2226, 192 L.Ed.2d 236 (2015) (internal quotation marks omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Id.* A regulation of speech is content-based if it "applies to particular speech because

---

nity for appellate review." *Id.* (citing *Alexander v. United States*, 509 U.S. 544, 553–54, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)). Indeed, in the context of Minnesota's state-law analogue to the TCPA, the Eighth Circuit concluded that this type of statute "is not a prior restraint, but a restriction on otherwise protected speech." *Van Bergen v. State of Minneosta*, 59 F.3d 1541, 1551 n.6 (8th Cir. 1995). Accordingly, LIUNA's prior-restraint argument frames the issue incorrectly and is unavailing.

of the topic discussed or the idea or message expressed." *Id.* at 2227. The level of constitutional scrutiny the Court must apply when analyzing LIUNA's First Amendment challenge to the TCPA depends on whether the TCPA is a content-neutral law or a content-based law. Therefore, the Court first addresses this threshold inquiry.

### 1. Content Neutrality

The Eighth Circuit has not addressed whether the TCPA is a content-neutral law or a content-based law. Consequently, Greenley and the United States rely heavily on *Van Bergen v. State of Minnesota*, in which the Eighth Circuit addressed a First Amendment challenge to Minnesota's state-law analogue to the TCPA. 59 F.3d 1541, 1550–51 (8th Cir. 1995). The *Van Bergen* court observed that, under Minnesota's law, "[a]ll callers, whatever the content of their messages may be, must have either the express or the implied consent of the subscriber, or consent obtained through a live operator, to deliver an [automated] message." *Id.* at 1551. The court reasoned that the groups exempted from the Minnesota law's restrictions "are defined by their relationship to the caller, not by the content of their messages." *Id.* Such exceptions, according to the *Van Bergen* court, merely identify subscribers who have impliedly consented to communications from the caller due to pre-existing relationships. *Id.* at 1551, 1556. Thus, the court concluded that Minnesota's law is "content-neutral, limiting not the content of telephone communications, but the time and manner in which they may be made." *Id.* at 1551.

In its briefing and at oral argument on its motion, LIUNA argued that *Van Bergen* was abrogated by *Reed v. Town of Gilbert*, —— U.S. ——, 135 S.Ct. 2218, 192 L.Ed.2d 236 (2015). However, the Eighth Circuit has since *confirmed* that *Reed* did not abrogate the *Van Bergen* decision,

which remains the binding precedent of the Eighth Circuit. *Gresham v. Swanson*, 866 F.3d 853, 856 (8th Cir. 2017); accord *Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 304, 306 (7th Cir. 2017) (citing *Van Bergen* decision favorably and concluding that it has "not been called into question by *Reed*"). This Court continues to be bound by the decision in *Van Bergen*.

The inquiry does not end with that conclusion, however. The *Van Bergen* decision addressed the constitutionality of Minnesota's state law, not the TCPA. Although the *Van Bergen* court observed that the Minnesota law is "virtually identical to the TCPA," that statement referred to the issue of preemption, not to whether the law is content-neutral. *See Van Bergen*, 59 F.3d at 1548 (internal quotation marks omitted). The *Van Bergen* court acknowledged that the TCPA differs from the Minnesota law in at least two respects, including the nature of its exceptions—a distinction that was material to whether the Minnesota law was content-neutral or content- based. *See id.* at 1548, 1551. Although *Van Bergen* is binding as to Minnesota's state-law analogue to the TCPA and may be instructive with respect to the TCPA, it is not dispositive as to the TCPA.

LIUNA argues that the Supreme Court's decision in *Reed* fundamentally changed the manner in which courts must determine whether a challenged law is content-neutral. In *Reed*, the Court addressed a constitutional challenge to a municipal sign code that prohibited the display of outdoor signs without a permit, for the ostensible purpose of promoting traffic safety and the town's aesthetics. 135 S. Ct. at 2224, 2231. The sign code exempted 23 categories of signs—including ideological signs, political signs, and temporary directional signs—and imposed different restrictions on different exempted categories. *Id.* at 2224. When analyzing whether

the sign code was content-neutral or content-based, the *Reed* Court explained that courts must look beyond an "innocuous justification" to determine whether the law makes facial distinctions based on content. *Id.* at 2228. A content-based distinction might be "obvious," such as when a law defines regulated speech "by particular subject matter," or it may be "more subtle," such as when a law defines regulated speech "by its function or purpose." *Id.* at 2227. Because both of these types of facial distinctions are "drawn based on the message a speaker conveys," they are subject to strict scrutiny. *Id.* Applying this framework, the Court concluded that the challenged sign code was content-based despite the government's innocuous justification for it because the sign code applied restrictions "depend[ing] entirely on the communicative content of the sign." *Id.*

According to LIUNA, the framework articulated in *Reed* represents a fundamental change in the law. This Court is mindful that other courts have grappled with this question. *See, e.g., Cahaly v. Larosa,* 796 F.3d 399, 405 (4th Cir. 2015) (concluding that *Reed* abrogated the Fourth Circuit's precedent regarding content neutrality, which treated the government's stated purpose for the law as controlling even if the law facially differentiated between types of speech); *Working Am., Inc. v. City of Bloomington,* 142 F.Supp.3d 823, 830 (D. Minn. 2015) (observing that *Reed* merely "reiterated the framework that determines whether governmental regulation of speech is content based or content neutral"). But this Court need not determine whether *Reed* changed the law or merely restated long-standing principles. Instead, in the absence of any Eighth Circuit precedent as to the constitutionality of the TCPA, this Court need only apply the framework from *Reed* to the TCPA.

The challenged TCPA restriction limits "any person" from using an ATDS "to make any call" to a cellular telephone. 47 U.S.C. § 227(b)(1). This restriction is akin to the state-law restriction at issue in *Van Bergen* in that all callers, whatever the content of their messages may be, must have the consent of the subscriber before sending an ATDS message. *See* 59 F.3d at 1551. On its face, this general restriction is content-neutral. But the TCPA's general restriction cannot be divorced from its statutory exceptions. The sign code in *Reed* generally prohibited the display of all outdoor signs without a permit, but nonetheless was facially content-based in light of its categorical exceptions to this general prohibition. 135 S.Ct. at 2224–27. In *Van Bergen,* the Eighth Circuit concluded that the exceptions in the Minnesota law are relationship-based and, therefore, content-neutral. *See* 59 F.3d at 1551. Yet, because the TCPA contains exceptions that differ from the exceptions in the Minnesota law, the decision in *Van Bergen* has limited value in this case. Here, the TCPA's statutory exceptions must be evaluated in light of the *Reed* framework.

As relevant to these circumstances, the TCPA contains three exceptions to its general prohibition: an exception that applies to any "call made for emergency purposes," 47 U.S.C. § 227(b)(1)(A); an exception that applies to any call "made solely to collect a debt owed to or guaranteed by the United States," *id.* § 227(b)(1)(A)(iii); and a provision that empowers the FCC to exempt calls made with an ATDS to a cell phone number if the calls "are not charged to the called party" and are "in the interest of the privacy rights [the TCPA] is intended to protect," *id.* § 227(b)(2)(C). Only four federal district courts have analyzed whether the TCPA, in light of its statutory exceptions, is content-neutral under the *Reed* framework. Two of those courts concluded

that the TCPA is content-neutral, and two concluded that the TCPA is content-based.

In *Mey v. Venture Data, LLC*, the Northern District of West Virginia concluded that the TCPA "does not draw distinctions based on the content of the speech or any message expressed," and that the three statutory exceptions "are based on the relationship of the speaker and recipient of the message rather than the content of the message." 245 F.Supp.3d. 771, 2017 WL 1193072, at *17 (N.D. W. Va. 2017) (internal quotation marks omitted). But the *Mey* decision provides no written analysis to support the conclusion that the TCPA's exceptions are content-neutral. *Id.* And the legal authority that *Mey* cites in support of the proposition that the TCPA's exceptions are relationship-based is a decision addressing Indiana's analog to the TCPA, which has different exceptions than the TCPA. *Id.* In *Woods v. Santander Consumer USA, Inc.*, the Northern District of Alabama did not address the second TCPA exception—the exception that pertains to government debts—because that exception was added by Congress after the conduct at issue in *Woods*. No. 2:14-cv-2104, 2017 WL 1178003, at *3 (N.D. Ala. Mar. 30, 2017). For the remaining two TCPA exceptions, *Woods* relied on pre-*Reed* decisions from the Ninth Circuit and two federal district courts to conclude, without conducting any independent analysis, that the TCPA is content-neutral. For these reasons, *Mey* and *Woods* have limited persuasive value.

By contrast, in *Brickman v. Facebook, Inc.*, the Northern District of California concluded that the third TCPA exception is content-neutral but that the first two exceptions are not. 230 F.Supp.3d 1036, 1044–45 (N.D. Cal. 2017). The *Brickman* court reasoned that the emergency excep-

tion is not merely situational because "[w]hether a call is 'necessary' in a situation affecting the health and safety of consumers would depend on the content of the call, not just whether an emergency situation exists." *Id.* With respect to the government-debt exception, the *Brickman* court reasoned that this exception is not relationship-based because the statutory language "makes no reference whatsoever to the relationship of the parties" and instead "applies to all calls made to collect debt owed or guaranteed by the United States." *Id.* In other words, the exception is based on the subject matter of the call regardless of the caller's relationship to the recipient. *Id.* As such, the *Brickman* court applied strict scrutiny to the TCPA. *Id.*; *see also Holt v. Facebook, Inc.*, 240 F.Supp.3d 1021, 1032 (N.D. Cal. 2017) (applying strict scrutiny to the TCPA and citing *Brickman*).[6] On balance, the analyses in *Brickman* and *Holt* are more instructive and persuasive than the decisions in *Mey* and *Woods*.

 Exceptions are relationship-based when they "depend on the relationship between the caller and the subscriber, not on what the caller proposes to say." *Gresham*, 866 F.3d at 856. As such, the exceptions in Minnesota's state-law analogue to the TCPA are relationship-based because they arise from "an assumption of implied consent" between parties with a preexisting relationship. *Id.* (reaffirming holding in *Van Bergen*). Such reasoning is inapposite to the TCPA's emergency exception, which is not based on any preexisting relationship or implied consent. The TCPA's emergency exception is not relationship-based at all. Nor is the TCPA's emergency exception merely "context" based, as Greenley argues. Rather, as the

---

**6.** The decisions in *Brickman* and *Holt* currently are pending review by the Ninth Circuit.

*Brickman* court reasoned, the applicability of the emergency exception necessarily "would depend on the content of the call, not just whether an emergency situation exists." *Brickman*, 230 .F.Supp.3d at 1044–45.

The TCPA's government-debt exception presents a closer question because in one sense it *is* relationship based—it arises from a creditor-debtor relationship between the government and the recipient of the communication. But that relationship is between the debtor and the government, whereas the debt collector initiating a telephone call often may be a third party that has no preexisting relationship with the debtor. Moreover, the government-debt exception includes a content-based component; it requires the content of the message to pertain to the collection of a government debt. This content-based component effectively elevates government-debt communications above other communications, such as messages that pertain to private debts or messages that do not pertain to debts at all.

The third exception does not substantively exempt any communications. Instead, it empowers the FCC to create additional exceptions for communications that promote the privacy interests that the TCPA is intended to protect and do not result in charges to the called party. As the *Brickman* court reasoned, this provision is not facially or inherently content-based because there are content-neutral ways for the FCC to implement it, including relationship-based exceptions. *Id.* at 1045. LIUNA argues that, pursuant to this provision, the FCC has promulgated content-based exceptions through FCC orders. The Administrative Orders Review Act, 28 U.S.C. §§ 2341, *et seq.*, confers jurisdiction on United States appellate courts to review final orders of certain federal agencies. *See Brown v. Nuclear Regulatory Comm'n*, 644 F.3d

726, 727 (8th Cir. 2011) (per curiam). As relevant here, United States appellate courts have "exclusive jurisdiction to enjoin, set aside, suspend (in whole or in part), or to determine the validity of .... all final orders of the Federal Communications Commission." 28 U.S.C. § 2342(1). Although LIUNA contends that it is not directly challenging the FCC orders, a "defensive attack on the FCC regulations is as much an evasion of the exclusive jurisdiction of the Court of Appeals as a preemptive strike by seeking an injunction." *United States v. Any & All Radio Station Transmission Equip.*, 207 F.3d 458, 463 (8th Cir. 2000); *accord Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1120 (11th Cir. 2014) (explaining that this "jurisdictional analysis looks to the 'practical effect' of a proceeding" rather than a party's central purpose). Because this Court lacks jurisdiction to entertain a constitutional challenge as it pertains to FCC orders, the Court does not consider those exceptions for the purpose of this analysis.

In summary, consistent with the conclusions reached in *Brickman* and *Holt*, this Court concludes that the first two TCPA exceptions render the TCPA content-based. For this reason, the Court must apply strict scrutiny to evaluate LIUNA's First Amendment challenge to the TCPA.

## 2. Strict Scrutiny Analysis

To survive strict scrutiny, "the government [must] prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S.Ct. at 2231. Although strict scrutiny is a difficult standard to satisfy, the Supreme Court has cautioned that it is not "strict in theory, but fatal in fact." *Williams–Yulee v. Fla. Bar*, — U.S. —, 135 S.Ct. 1656, 1666, 191 L.Ed.2d 570 (2015) (quoting *Adarand Constructors*,

*Inc. v. Pena,* 515 U.S. 200, 237, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995)).

### a. Compelling Interest

The first part of the strict scrutiny inquiry considers whether the TCPA serves a compelling interest. Here, both Greenley and the United States argue—and LIUNA does not dispute—that the TCPA serves a compelling interest in protecting residential privacy. That this is a compelling interest is well-established in the Eighth Circuit and elsewhere. *See, e.g., Van Bergen,* 59 F.3d at 1554 ("Residential privacy is a significant government interest."); *Patriotic Veterans,* 845 F.3d at 305 ("No one can deny the legitimacy of the state's goal: Preventing the phone (at home or in one's pocket) from frequently ringing with unwanted calls."); *Cahaly,* 796 F.3d at 405 (assuming government interest in protecting residential privacy and tranquility is compelling); *Brickman,* 230 F.Supp.3d at 1045 (observing that Congress enacted the TCPA to protect residential privacy interests from nuisance and invasion). The Court concludes that the TCPA serves a compelling government interest in promoting and protecting residential privacy.

### b. Narrowly Tailored

A law that serves a compelling interest also must be narrowly tailored to achieve that interest. *Reed,* 135 S.Ct. at 2231. LIUNA argues that the TCPA is not narrowly tailored because it is both underinclusive and overinclusive.

LIUNA first asserts that the TCPA is underinclusive because it exempts "an array of communications" and leaves the public open to the concerns about privacy and unwanted intrusion that the TCPA was intended to address. As previously explained, this Court lacks jurisdiction to address the validity of exceptions created by an FCC order. Consequently,

this Court's analysis necessarily is limited to the statutory exceptions described above.

Although "underinclusivity raises a red flag, the First Amendment imposes no freestanding 'underinclusiveness limitation.'" *Williams–Yulee,* 135 S.Ct. at 1668. "It is always somewhat counterintuitive to argue that a law violates the First Amendment by abridging *too little* speech." *Id.* (emphasis in original). But underinclusiveness "can raise doubts as to whether the government is pursuing an interest it invokes or whether the statute furthers a compelling interest." *Brickman,* 230 F.Supp.3d at 1045 (citing *Williams–Yulee,* 135 S.Ct. at 1668).

In *Reed,* the Supreme Court concluded that the challenged municipal sign code was underinclusive because, although it sought to preserve the town's aesthetics and promote traffic safety by prohibiting outdoor signs without a permit, the sign code included twenty-three exceptions that permitted "unlimited proliferation" of one type of sign "while strictly limiting" a different type of sign. 135 S.Ct. at 2231. In contrast, the TCPA contains only two content-based statutory exceptions; and neither exception permits "unlimited proliferation" of the exempted category of automated calls. Rather, the emergency exception is limited to communications made in particular situations and for particular purposes, and the government-debt exception permits calls only to recipients who owe a debt to the federal government. *See Holt,* 240 F.Supp.3d at 1032 (reaching same conclusion); *Brickman,* 230 F.Supp.3d at 1047–48 (same). Undoubtedly, under these exceptions, the government is pursuing the compelling interest of promoting and protecting residential privacy. The TCPA is not underinclusive.

LIUNA also argues that the TCPA is overinclusive because it unneces-

sarily limits protected expression, including the political and labor speech at issue here, without using the least restrictive means to achieve the objectives of Congress. "Less restrictive alternatives' [must] be *at least as effective* in achieving the legitimate purpose that statute was enacted to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997) (emphasis added). LIUNA relies on *Cahaly*, in which the Fourth Circuit observed that plausible less-restrictive alternatives might include time-of-day limitations, mandatory disclosure of the caller's identity, or do-not-call lists. 796 F.3d at 406. Greenley and the United States counter with *Brickman* and *Holt*, which rejected this argument and distinguished *Cahaly*. In both *Brickman* and *Holt*, the district court observed that the government did not argue in *Cahaly* that these alternatives would not be effective, which distinguishes *Cahaly* from the circumstances presented here. In addition, both the *Brickman* court and the *Holt* court reasoned that the hypothetical alternatives discussed in *Cahaly* would not be as effective in achieving the legitimate purpose that the TCPA was enacted to serve:

> Time-of-day limitations would not achieve the same privacy objectives because even though such a restriction may designate the span of time in which callers can intrude on an individual's privacy, it would also designate a time for intrusive phone calls. Mandatory disclosure of a caller's identity and disconnection requirements would also not be as effective in achieving residential privacy because these would not prevent the privacy intrusion from the phone call in the first place. Do-not-call lists would also not be a plausible less restrictive alternative because placing the burden on consumers to opt-out of intrusive calls, rather than requiring consumers to opt-in, would obviously not be as effective in achieving residential privacy.

*Holt*, 240 F.Supp.3d at 1034 (quoting *Brickman*, 230 F.Supp.3d at 1048–49).

The reasoning in *Brickman* and *Holt* is persuasive. As those courts observed, the hypothetical less-restrictive alternatives advanced by LIUNA would not be "*at least as effective* in achieving the legitimate purpose" that the TCPA was enacted to serve. *Reno*, 521 U.S. at 874, 117 S.Ct. 2329 (emphasis added). Moreover, the TCPA is limited in what it prohibits, in that it merely restricts calls made using an ATDS without first obtaining the express consent of the recipient. *Brickman*, 230 F.Supp.3d at 1048 (citing 47 U.S.C. § 227(b)(1)(a)). The TCPA leaves open myriad alternative avenues for LIUNA to disseminate its messages to Greenley or anyone else. Thus, the TCPA is not overinclusive.

In summary, the Court concludes that the TCPA is a content-based restriction on speech, but the TCPA survives strict scrutiny because it is narrowly tailored to serve a compelling interest. LIUNA's facial challenge to the constitutionality of the TCPA is unavailing, and the Court denies LIUNA's motion to dismiss on this basis.

## B. As–Applied Challenge

LIUNA contends that the TCPA also violates the First Amendment as applied to the messages LIUNA sent to Greenley. Whereas a facial challenge applies to an entire legislative enactment or provision, "[a]n as-applied challenge consists of a challenge to the statute's application only as-applied to the party before the court." *Minn. Majority*, 708 F.3d at 1059 (internal quotation marks omitted). "If an as-applied challenge is successful, the statute may not be applied to the challenger, but is otherwise enforceable." *Id.* (internal quotation marks omitted).

The parties have suggested, in their briefing and at oral argument, that LIU-

NA has raised an as-applied challenge to the TCPA. But LIUNA's arguments do not articulate an as-applied challenge. Although LIUNA references "protected expression, including the political and labor speech at issue in this case," it does so in the context of its facial challenge to further its argument that the TCPA is overinclusive of protected expression generally. The entirety of LIUNA's substantive analysis relates to its facial challenge. The Court concludes that LIUNA has not established that dismissal is warranted on an as-applied basis.

## ORDER

Based on the foregoing analysis and all the files, records and proceedings herein, **IT IS HEREBY ORDERED** that Defendant Laborers' International Union of North America's motion to dismiss, (Dkt. 22), is **DENIED**.